## ROBERT T. MULLIGAN *v.* STATE OF MARYLAND

[No. 343, September Term, 1968.]

*Decided April 25, 1969.*

*Arthur Dale Leach,* with whom were *W. Byron Sorrell, Richard S. Paulson,* and *George A. Wilkinson, Jr.,* on the brief, for appellant.

*Thomas N. Biddison, Jr., Assistant Attorney General,* with

whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Hilary D. Caplan, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The controlling point on this appeal is the use by the prosecution of a statement obtained by the police during a custodial interrogation of the appellant. The statement was obtained on 3 June 1966, prior to the decision in *Miranda v. State of Arizona,* 384 U. S. 436, and used by the prosecution at the trial of the appellant on 15 May 1968, subsequent to the decision in *Miranda.* We are compelled by the *Miranda* holding to reverse the conviction of the appellant of murder in the second degree at a court trial in the Criminal Court of Baltimore and set aside his sentence of 12 years.

*Miranda* dealt specifically with the admissibility of statements obtained from an individual who is subjected to custodial police interrogation, which the Court characterized as raising questions which went to the roots of our concepts of American criminal jurisprudence: the restraints society must observe consistent with the Federal Constitution in prosecuting individuals for crime. p. 439. The Court started with the premises, as it did in *Escobedo v. State of Illinois,* 378 U. S. 478, decided two years before, that its holding was not an innovation in our jurisprudence, but was an application of principles long recognized and applied in other settings. p. 442.[1] It endeavored to explore some facets of the problems exposed by *Escobedo* and to give concrete constitutional guidelines for law enforcement agencies and courts to follow. It did so with specificity but it first briefly stated its holding to be: "The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination." p. 444. It stated, however, that confessions remain a proper element in law enforcement. "Any

---

1. See *Dennis v. Warden,* 6 Md. App. 295, in which we traced the decisions of the Supreme Court leading to *Miranda.*

statement given freely and voluntarily without any compelling influences, is, of course, admissible in evidence." p. 478. But it made clear that a statement obtained in the absence of the procedural guidelines enunciated was not "without any compelling influences." The applicability of the *Miranda* holding to other cases is determinative, not by the time of interrogation, but by the time of trial; *Miranda* applies to those cases in which the trial began after the date of the *Miranda* decision, 13 June 1966. *Johnson v. State of New Jersey,* 384 U. S. 719, 721.

*Miranda* spelled out in detail the Court's meaning of "custodial interrogation", the warnings that must be given prior to any questioning, what may constitute a waiver by the defendant of rights required to be made known to him, and the procedure to be followed if the rights are not waived. While the procedural guidelines and the exclusionary rules it enunciated did not result in a discard of the old voluntariness test entirely, we think it clear from the opinion that if the procedural guidelines are not followed, a statement obtained is *per se* to be excluded, permitting the State no opportunity to show that the admission of a statement so obtained was harmless error, as the State may do with respect to a judicial identification made after an illegal confrontation, which is part of the exclusionary rule enunciated in *United States v. Wade,* 388 U. S. 218, 242. See *George Sanders Smith v. State,* 6 Md. App. 59; *Smithson v. State,* 5 Md. App. 378, 381-382.

We have discussed and interpreted *Miranda* and applied its holding in a number of cases. But none has reached us with a factual situation comparable to that which is now before us.

The indictment charging the appellant with murder resulted from the death on 30 May 1966 of Mary L. Mulligan, 8 months of age. From the time she was 5 days old she had lived with the appellant, Robert T. Mulligan and his wife, Rachel Mulligan, who had instituted proceedings to adopt her. They had been married in 1958, a daughter had been born of the marriage four and a half years later and a second daughter was born on 16 September 1966. Robert Mulligan had attended Washington Masonry College, Antietam Park, Maryland for three years, majoring in accounting and was teaching accounting at the Greater Baltimore Academy. Rachel Mulligan was a registered nurse,

employed at St. Agnes Hospital. The Mulligans had been investigated by the Probation Department of the Supreme Bench of Baltimore City and the adoption was about to be "consummated" at the time of the child's death. Rachel Mulligan, on 29 and 30 May was working from 11:45 P.M. to 7:45 A.M. at St. Agnes Hospital. When she left home about 11:30 P.M. the child "was okay when she was put to bed and was sleeping." At the time her husband and their three year old daughter, Theda, were the only others in the house. Both had also gone to bed. She arrived home about 8:00 A.M. 30 May. Her husband and both children were there. Mary "appeared all right to me * * * I looked at her but there was nothing unusual." Her husband said "something to the effect that she had thrown up during the night. * * * that didn't seem to be anything unusual, both girls have done this at some time or other * * * he did say she was a little fussy during the night." When she arrived home Mary was in her chair in the dining room. Her husband told her that when she was "fussy" during the night and "he tried to comfort her, he rocked her (and) tried to give her another bottle." She fed the child and put her to bed. She appeared to be normal and took her usual morning nap. The mother took a nap and about 10:30 A.M. "went up and checked on her." She noticed that the child's "eyes were staring off into space, and she appeared funny. I didn't know what to think." She changed the child's diaper and called her husband, who was at school ("he taught in our denomination school and they had school that day"). "I figured if I had to take her to the hospital that would be the fastest way to get her there because the school is only several minutes from where we lived." Her husband came right home. "He picked her up, ran to the car with her, and then he couldn't find his keys, the car keys, so a neighbor was out in the back yard and he said he would take us. He is a fireman and he stopped off at the fire house * * * The fireman took her * * * to the hospital in the ambulance * * * (at the fire house and) in the ambulance they gave her mouth to mouth resuscitation and artificial respiration." At the hospital they were told that the child had died.

Dr. Frank Detorie, completing his third year in surgery at St. Agnes Hospital, saw the child at the hospital on 30 May

1966. She was brought in by ambulance drivers and they were attempting mouth to mouth resuscitation. "It was apparent to me that the child had been dead for quite some time * * *." The closest he could approximate the time of death "purely based on the fact the child's body was still warm, would be within twenty to twenty-four hours." He described the baby as he examined it that day:

> "In looking the child over I noticed several marks of contusion on the body. A prominent one was in the face, at the chin. There were several bruises on the legs, and in noticing these, I turned the child's body over and noticed very large bruises in the lower back, in the middle portion of the lower back. * * *
>
> The bruise on the face was rather large and the bruise on the lower back was rather prominent it seemed; a large amount of contusion evidence in the back, the ones on the legs were rather smaller bruises."

It was his opinion that "the bruises on the lower extremities could have been attributed to falls and banging against one another. However the bruise on the chin and the large bruise on the back would be difficult to explain in this fashion." He asked the parents about the current health of the child and there was no indication from them that she had been ill. "I questioned them also about the bruises on the body, and again there was no indication to me that the parents were aware of any accident or of any recent trauma that the child was submitted to. I became suspicious because you cannot explain away bruises such as those without some knowledge of how they occurred. So in an apparently healthy child arriving at the hospital dead, with several large bruises on its body, I became suspicious of the cause of death." He notified the Medical Examiner. He became aware later of a previous admittance of the child to the hospital. The diagnosis at that time was multi-fractures of the meta-carpal. He stated that the bruising of the child's back could not have been caused by the efforts at artificial respiration. He was referred to the hospital record on the child dated 28 February 1966. He read into the record: "Bone survey shows that this child apparently had X-rays involving every part of its

body. Basically no fractures of the skull. Fracture of the left hand, fracture of the meta-carpal of the left hand and some calcification around the pelvis. Diagnosis: A battered child syndrome is being entered of its beaten body." It was signed by Dr. Joyce Boyd.

Dr. Joyce Boyd, a pediatric resident at St. Agnes Hospital, had seen Mary Mulligan in the emergency room in February of 1966. Her findings and diagnosis on 28 February were that the X-rays showed a fracture of the skull, and meta-carpal of the left hand (the left ulna and left carpal) and calcification around the pelvis and "the diagnosis of a battered baby syndrome was entertained." When she first examined the child she was holding her leg in a peculiar position, not moving the left hip or knee nor the left ankle or toes. She remained in the hospital 16 days. On cross-examination she explained that as to the skull "it was a linear depressed fracture * * * you cannot tell by looking at the X-ray whether it is a serious fracture or not * * * it was just a small fracture. There was no "definite fracture of the left leg" but "there was a possibility of a fracture." The baby was treated for an upper respiratory infection but the final diagnosis was "No.1: Multiple fractures metacarpal, ulna and skull; No.2: Subperiosteal hemotoma; No.3: Acute upper respiratory infection."

Dr. Werner Spitz, Assistant Medical Examiner of the State of Maryland, performed the autopsy on the child. "The child had superficial abrasions; a number of insignificant abrasions on the back and on the scalp. The X-ray showed one or several old fractures, healed fractures on the left leg—left thigh. The cause of death was inflammation of the abdominal cavity, of the organs of the abdominal cavity. An abundant piece of the abdomen due to a laceration of the small bowel following blunt trauma of the abdomen." He was asked to give his opinion of the cause of death. He said:

"Well, the sequence here, there was no doubt in my mind as to the sequence. The sequence was that a blunt trauma took place in the child's abdomen. This caused a laceration of the bowel with a compellant flow of intestinal juices and feces into abdominal cav-

ity and, of course, subsequent inflammation which in turn caused death.

Apart from this, the evidence of one of my staff, from the evidence of one of my staff I tend to believe there was more than one fracture of the thighbone, which to me made the entire picture—to me it appeared as falling into the general category of a battered child."

He said that the findings at the time of autopsy "are consistent with a battered child syndrome." The signs of healed fractures influenced this opinion. "The reason is that bones don't break up on their own initiative unless they are diseased, and with the same certainty I could see that some injury has taken place to the thigh of this child with the same certainty I could see that a blow or impact has taken place on its abdomen, and by the same token it could have taken place to this thigh or an arm or any other location." There were superficial bruises of both thighs and of the legs on the front of the body. The back of the child contained a bruise and abrasion over the middle of the back, within the mid-lines. "I think that this point is important. The reason I attributed importance to this was * * * these two injuries in conjunction with an impact to the abdomen * * * At the time I saw the bruises and abrasions on the back and then completed the autopsy and found the hole in the guts, I formed an opinion as to the mechanism of the injury * * * I think the child when hit, it was one or two maybe three days, was that it was tied in with the child's back against a solid, hard surface. It would not be unacceptable that the child was at that time, for example, sitting in a high chair. Incidentally I would like to mention that the bruises of the leg were such as would be made with a blunt force of some character." As to the back bruise, "I think the force would apply to the front against a hard surface, a child sitting or lying with back against a hard surface." On cross-examination he was asked if it was correct that he concluded that the baby had been dead some three or four days prior to the autopsy on 31 May. He stated that he had not so testified and was asked if he had an opinion when the baby died. He stated that it would be difficult to re-establish at this point. The date of death as 30

May "was perfectly acceptable at the time of the autopsy, and it would come to my mind that something is fishy if I had been told that death had occurred one or two, three or four days before. The baby, to my knowledge, had died within the past twelve hours or so (from the time of the autopsy)." The date of 30 May as the time of death "seemed perfectly all right and not necessarily to be questioned. There was no need to question it." Cross-examined at length as to the direct cause of death, he was finally asked whether the laceration of the duodenum, through which intestinal juices exuded, causing inflammation, could have been caused by pressure upon the body just as readily as a blow. "In other words, if there was some sort of a pathological defect in this area, could pressure upon the body cause this rupture just as readily as a blow." The witness answered:

> "I examined this child, I examined it thoroughly, and I examined it with close to fifteen years of experience, and I found no disease in the entire child except the inflammation we saw here, which resulted on leakage from this hole or laceration.
> With respect to your question, the answer is no. Gentle pressure or strong pressure or any pressure which is not a blunt impact, would not cause this."

He explained the reason for his answer fully. His final conclusion was that "I cannot conceive of anything in this case beside the blow." It was also his opinion that the blow would not have caused instantaneous death "because otherwise there wouldn't have been all this infection, and in my estimation it would have taken one or three days—or two or three days for the infection to develop, it takes time for an infection to develop, and it takes time for it to accumulate," but it possibly could have been a lesser time. While the infection was developing the baby would have suffered pain. It was the opinion of the Medical Examiner that she died "of purulent peritonitis due to laceration of duodenum following blunt force injury to the abdomen. The anatomical changes as determined upon external examinaconsistent with a battered child syndrome."

We think this evidence was sufficient to prove the *corpus delicti.* The trial court could have properly found that the death of the child was a homicide and that the homicide was murder. See *Dyson v. State,* 6 Md. App. 453. We have set out the above evidence in some detail as necessary background in considering the controlling point of the case on appeal. The *corpus delicti* having been established, the issue was the criminal agency of the appellant. The criminal agency of the appellant depended in large part upon admissions he made that he had beat the child.

The appellant was arrested on 3 June 1966. Lt. Charles Goodrich testified that "up to the point of the statement by the Medical Officer, this was a case of a sick child who died at the hospital * * * The reason we made the arrest was based on the information of the medical examination by Dr. Spitz." The Lieutenant went to the school where the appellant was employed, explained that they were investigating the death of Mary L. Mulligan and he agreed to go to the Southwestern Police Station. If he had refused to go "he would have been arrested and taken in." At the police station he was "booked for investigation" and placed in a cell block. It appears that during the interval between the arrival at the police station and the placing of the appellant in the cell block he was asked whether he had anything to add to the report "he gave the hospital as to the baby." It cannot be clearly ascertained from the record whether the appellant was advised of his "rights" before he was asked this question. The Lieutenant testified that when he and the appellant went to the Southwestern Station "we talked and asked Mr. Mulligan if he had any information to add in the police report. He said he did not. Upon arriving at the Southwestern District, he was then booked for investigation and we advised him at this time of counsel, he was informed of his right to have counsel present during any interrogation he would be subjected to thereafter." The extent of the "talk", the nature of it, what discussion, if any, took place with regard to the police report and the extent of it, was not disclosed. We think that the appellant was in custody within the meaning of *Miranda* at the time he accompanied the officer from the school to the police station. We cannot say that the appellant was not

"deprived of his freedom in any significant way." 384 U. S. 444. Nor can we determine from the transcript whether there was an "interrogation" of the appellant before he was placed in the cell block, although we note that "interrogation" as used in the definition of "custodial interrogation" in *Miranda* is stated as "meaning any questioning initiated by law enforcement officers." 384 U. S. 444.

After the appellant was "booked for investigation" and placed in the cell block, the police went to the appellant's residence and were admitted by his wife. They told her they were investigating the death of the child, that "her husband was in custody at the Southwestern station." They asked her if she would go there "so that we could continue our investigation and she said she would." The Lieutenant testified he was investigating the cause of death after receiving the statement of the Medical Examiner "and everybody I came in contact with would be a suspect under that statement." He asserted that Mrs. Mulligan was not at any time arrested. "In no way, shape or form was she in custody. She came to the station with us of her own volition." They went to the policewomen's room on the second floor. The Lieutenant sent down to the cell block for the appellant and he was brought up to the room. As soon as he came into the room he and his wife engaged in a conversation. "Who started the conversation I don't strictly recall, but I do know they struck up a conversation without anyone's (the police) saying anything at all, then started up this conversation." No one was taking notes, "they caught us by surprise." No "pressure or force or violence" was used on the appellant by the Lieutenant or anyone in his presence, and no "threats or any promises were made to him." In the course of this conversation, in the presence of the police, the Lieutenant heard the appellant tell his wife that he had beat the child on 30 May 1966. After the conversation between the appellant and his wife concluded, "he was then told of his rights" and made a statement.

It is clear that at no time was there full compliance with the procedural safeguards required by *Miranda*. Assuming the appellant was given warnings when he first arrived at the police station the testimony was that "he was informed of his right to have counsel present during any interrogation he would be

subjected to thereafter." After the conversation with his wife in the police room immediately preceding the statement to the police the Lieutenant said, "I told him he had the right to have an attorney present before he said anything, he had a right to contact an attorney at the time he was to be interrogated. We couldn't go out and find him an attorney, but if he wanted an attorney we would have allowed him to do so." He also said he told the appellant that anything he said could be used against him in a court of law. However the officer admitted he missed one of the *Miranda* warnings and the State conceded at the trial that the appellant was not told that if he could not afford an attorney one would be appointed for him. We note that in addition the appellant was not informed that he had the right to remain silent. In discussing with specificity the warning as to right to counsel the Court said in *Miranda:*

> "In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one." 384 U. S. 473.

In discussing the warning as to the right to remain silent, the Court said:

> "At the outset, if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it —the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. It is not just the subnormal or woefully ignorant who succumb

to an interrogator's imprecations, whether implied or expressly stated, that the interrogation will continue until a confession is obtained or that silence in the face of accusation is itself damning and will bode ill when presented to a jury. Further, the warning will show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it.

The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given." 384 U. S. 467-468.

The statement given by the appellant at the conclusion of the conversation between him and his wife was obtained by the police during a custodial interrogation. As the warnings as required were not given, that statement was not admissible in evidence and if admitted there would be prejudicial error.

During the examination of Rachel Mulligan on behalf of the State it was elicited that on 25 April 1968, almost two years after the arrest of the appellant and the occurrences in the room at the police station, an Assistant State's Attorney, accompanied by police officers, went to the home of the appellant and talked to his wife. She gave a statement at that time. Early in her examination the State showed her the statement and asked her to read it. Objection was made and sustained, the trial court saying, "You may use it to impeach the witness if she proves hostile." Later in her examination she said that her husband, when he came in the room at the police station on the day of his arrest and saw her, "said something to the effect that he had beaten the child" and after that there was a formal interrogation at which she was present. Then she went home. After her husband had been released on bail (a week after his arrest) and returned home he denied he had beat the baby and "that's where we dropped it." Pressed further, she said, "He said, well he had tapped the baby, but that's normal when you are trying to stop it from crying." The Assistant State's Attorney then

said, "I don't want to impeach the witness unless it is absolutely necessary, but the statement (made by the wife on 25 April 1968) now becomes an important item in this trial. The testimony that she has given as to certain statements in this statement are now in issue as to impeachment, and I am hereby stressing that point and I would like to show her the statement that directly contradicts what she has said as to this child." Objection was made and overruled. The Assistant State's Attorney showed her the statement. She said it was the one she gave the police and was asked to read it. She said, "This is the same thing I have been telling you now as far as I am concerned, what I said there is the truth." The Assistant State's Attorney read the statement into the record and it was then introduced into evidence over objection. The document, in handwriting, read as follows:

"4/25/68—12:05 P.M.

My name is Rachel Mulligan. I live at 1932 Wendover Ave., Balt. County Md. Concerning the death of my infant child Mary Lynn Mulligan on the 30th of May 1966, I wish to state the following:

My husband Robert Mulligan could have told me about beating my child Mary Lynn prior to arriving at the Police Station on June 3, 1966. I do not recall exactly what was said. However he did admit beating my child Mary Lynn on May 30, 1966 to the police in my presence. Also my husband Robert Mulligan told me at the police station, prior to the statement he gave the police, that he told me he had beaten my baby Mary Lynn.

After the statement was given by my husband Robert Mulligan, we had conversation about the death of my baby, Mary Lynn. Robert admitted to me that he did tap the child but that he did not intend to hurt it. Witnesses

*Sgt. Charles Goodrich    P. W. Joan C. Johnson    Rachel Mulligan*"

The word "tap" in the last paragraph was originally written as "beat". "Beat" had been scratched over and "tap" written

above it followed by the initials "RM". We do not believe that the statement "directly contradicts" the testimony given by the witness before its introduction in evidence. But what it did was to put into evidence the fact that the appellant had admitted beating the child to the police during their interrogation of him which took place at the conclusion of the conversation between him and his wife at the police station. The statement obtained by the police at that time was not offered as such by the State, the State even arguing at one point of the trial when the Lieutenant was being cross-examined as to the *Miranda* warnings that the non-compliance with the procedural safeguards of *Miranda* were immaterial because "we are not attempting to introduce the formal written and oral statement * * * The State has no intention of the introduction of any statement made by the defendant." We think it was as fully error for the State to get into evidence in this manner the inadmissible statement of the appellant that he beat the baby, obtained by the police during custodial interrogation, as if it had elicited it directly from the police and introduced it in evidence. *Miranda* does not equivocate in its holding that *"the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant, unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination."* (emphasis added) 384 U. S. 444.[2] Thus the receipt into evidence of the statement given by Rachel Mulligan, by placing before the trier of fact the admission made by the appellant during an illegal custodial police interrogation, compels reversal of the judgment.

In view of our holding we feel it advisable to consider only one other question presented by the appellant on appeal. This question involves the competency and compellability of the ap-

2. The opinion makes no distinction between confessions and admissions or between exculpatory or inculpatory statements. It states that even statements meant to be exculpatory by the defendant may not be used to impeach his testimony or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. 384 U. S. 476-477. Testifying on his own behalf the appellant denied beating the child or "employing any form of punishment or beating *per se* to that baby."

pellant's wife to testify against him. Md. Code, Art. 35, § 4, provides in relevant part:

"* * * In all criminal proceedings the husband or wife of the accused party shall be competent to testify; but in no case, civil or criminal, shall any husband or wife be competent to disclose any confidential communication made by the one to the other during the marriage, * * *."

The admission made by the appellant to his wife in the presence of the police when he saw her in the room in the police station was not a confidential communication under the Act, as it was made in the hearing of a third person. *Gutridge v. State*, 236 Md. 514; *Master v. Master*, 223 Md. 618. The appellant's wife was competent to disclose it.

We think that the appellant's wife was a compellable witness at his trial. Art. 35, § 4, as in effect at the time of the appellant's statement to his wife at the police station, continued: "nor shall the husband or wife be compelled to testify as an adverse party or witness in any criminal proceeding involving his or her spouse; * * *." But Chapter 176, Acts 1967, effective 1 June 1967, deleted the semicolon at the end of the above quote and inserting a comma in its place, added:

"except when such proceedings involves the abuse of a child under sixteen years pursuant to Section 11A of Article 27 of this Code, as amended from time to time; * * *."

The appellant's trial was subsequent to the effective date of the amendment. The appellant argues that the exception as to compellability relates only to proceedings under Md. Code, Art. 27, § 11A, and as he was indicted for murder his wife could not be compelled to testify.

Art. 27 is entitled "Crimes and Punishments" and under a subtitle thereof, "Assault on Child", § 11A is entitled "Mistreating child under sixteen". Subsection (a) is entitled "Penalty" and provides:

"Any parent, adoptive parent or other person who

> has the permanent or temporary care or custody or responsibility for the supervision of a minor child under the age of sixteen years who maliciously beats, strikes or otherwise mistreats such minor child to such degree as to require medical treatment for such child shall be guilty of a felony, and upon conviction shall be sentenced to not more than fifteen years in the penitentiary."

The section in various subsections gives definitions, provides what persons shall report abuse of a child, gives the form and contents of such reports, provides for investigations, for action to be taken, for immunity from civil liability as to certain persons in making reports and for a central registry of cases. Subsection (f), providing for action to be taken, includes:

> "The local State's attorney and other appropriate law enforcement agencies having jurisdiction shall take such lawful action as may be appropriate in the circumstances."

If the mistreatment of the child results in its death, § 11A does not preclude that the appropriate lawful action to be taken would be to charge the person having the custody of the child and so assaulting it with murder, even though murder is a substantive offense apart from § 11A. In other words we believe that a trial on a charge of murder where the homicide was the result of the malicious mistreatment of a child under the age of sixteen by a person who has custody of such child is a criminal proceeding within the contemplation of Art. 35, § 4. We note that the title to Chapter 176, Acts 1967 reads:

> "AN ACT to repeal and re-enact, with amendments, Section 4 of Article 35 of the Annotated Code of Maryland (1965 Replacement Volume), title "Evidence", subtitle "Competency of Witness", to require a husband or wife to testify as an adverse party against the other spouse in criminal proceedings *involving the abuse of a minor under the age of sixteen years.*"
> (emphasis added)

And we further note that the exception in the Act is applicable "when such (criminal) proceedings involves the abuse of a

child under sixteen years." We cannot find the legislative intent to have been that the words in the Act immediately following—"pursuant to Section 11A of Article 27 of this Code" —preclude a criminal proceeding of murder involving the abuse of a child. To adopt the restricted meaning of the exception urged by the appellant would reach the point of absurdity; one spouse could be compelled to testify against the other no matter how serious the injuries were inflicted by the abuse, even if the child was permanently incapacitated or maimed as a result thereof, but not if it died. We hold that the wife of the appellant was a compellable witness.

The State may again try the appellant.[3] We point out that we have not detemined whether the appellant was subjected to a "custodial interrogation" within the meaning of *Miranda* when he first arrived at the police station after he was taken in custody and whether his statement that he had nothing to add to the police report was properly admissible. Nor have we decided whether the admission of the appellant that he beat the child made by him during the conversation with his wife in the presence of the police at the police station before he made the formal statement to the police was admissible, other than to hold that it was not inadmissible as a confidential communication. We note, however, that the Court said in *Miranda*:

> "In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other state-

---

**3.** See *Orozco v. State of Texas,* 393 U. S. 822, decided 25 March 1969, note 4.

618

ment he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding to-day." 384 U. S. 478.

And see *Bazzell v. State,* 6 Md. App. 194; *Richardson v. State,* 6 Md. App. 448. Cf. *Orozco v. State of Texas,* 393 U. S. 822. If it is necessary to resolve these points on retrial, their deter-mination could only be properly made on the evidence with re-spect to them then offered.

> *Judgment reversed; case remanded for a new trial; costs to be paid by the Mayor and City Council of Baltimore City.*