CLARENCE JAMES SUTTON, THE YOUNGER *v.* STATE OF MARYLAND

[No. 643, September Term, 1974.]

*Decided March 18, 1975.*

---

310

The cause was argued before ORTH, C. J. and MOYLAN and GILBERT, JJ.

*Michael S. Libowitz, Assigned Public Defender,* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Walter Balint, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

Clarence James Sutton, appellant, was indicted by the Grand Jury for Baltimore City for the murder of John Herring and for the assault with intent to murder of Tommie Graham. A petit jury, in the Criminal Court of Baltimore, convicted appellant of the lesser charges of manslaughter in the Herring slaying and assault and battery upon Tommie Graham. The trial judge imposed terms of ten years and five years respectively upon appellant with the latter sentence to be served consecutively to the former. Sutton has appealed to this Court.

Appellant has unleashed a nine pronged attack upon the judgments of the Criminal Court of Baltimore, but because we are compelled to reverse the case, we shall deal with only those issues as are necessary, or we deem advisable to discuss.

## THE FACTS

On September 20, 1973, at approximately 4 P.M., Tommie Graham entered the house in which he resided. The premises is designated as 1309 East Federal Street, Baltimore City, and appears from the record to be a rooming house. Graham, John Herring, J. C. Sutton, the appellant's brother, William Moore and the appellant all resided in the house. The roomers shared the living room, dining room and kitchen facilities.

There is evidence that Graham was brutally beaten by the appellant and an unidentified person described simply as "big man". The record is unclear as to whether "big man" is a description of the individual or his nickname. During the assault upon Graham, Herring injected himself into the matter by suggesting that appellant and "big man" cease their beating of Graham. At that point appellant, according to Graham, told Herring to ". . . [S]hut up or we will kill you." Herring told the next door neighbor, his landlady's daughter, Frieda Anderson, about the on-going beating of Graham. She went into 1309 East Federal Street in what proved to be an aborted attempt to stop the fray. She was

312

told by appellant, "You had better get . . . out of here or we will fuck you up, too." Shortly afterwards both of Graham's assailants left the house. Graham was dispatched in an ambulance to a hospital. Herring accompanied him. According to Graham, before appellant and "big man" departed the scene, appellant told Herring, "Nigger, shut up. You are talking too motherfucking much." Appellant then said, "I'm going to kill you, nigger."

Later the same date Herring told Frieda Anderson that he "was afraid to go back over there" to his room in 1309 East Federal Street. He said he was fearful that appellant "would kill him." Another daughter of the landlady testified that during the night she heard "a whole lot of noise going on . . . next door [at 1309] . . . ." It sounded to her as if furniture was being moved and there was "moving around in the room." The deceased occupied the second floor front of 1309, and the witness had been seated in the corresponding room in the abutting house.

In the early morning hours of September 21, 1973, William Moore returned to 1309 where he discovered the room of Herring to be in shambles. He found Herring's dead, badly beaten and cut body in the third floor room that had been rented by Graham. The police were called, and a warrant was subsequently obtained for appellant's arrest. The arrest was consummated in Columbus, Georgia, on November 20, 1973.

I.

"The court erred in not granting a severance of the two charges against the appellant."

Appellant argues that the two separate indictments should not have been called to trial at the same time, and that the trial judge abused his discretion in not ordering a severance. Appellant asserts that there was no link between the assault upon Graham and the killing of Herring. Furthermore, appellant finds something insidious in the fact that the indictment charging the Herring slaying was handed down on December 12, 1973, while the indictment

arising from the Graham assault did not occur until April 12, 1974.

We know of no rule of law that requires the State to seek all indictments against a particular accused at the same time, and we are unpersuaded that there is no link between the two crimes with which appellant was charged. The State's evidence shows that the Herring killing arose directly from Herring's attempt to play the role of the "Good Samaritan" during the beating of Graham, and thus the two crimes were to that extent, at least, interrelated. The case against appellant is built solely on circumstantial evidence, and thus it was necessary for the State to demonstrate a motive or intent on the part of the appellant to kill Herring. That motive or intent is clearly found within the factual situation surrounding the assault upon Graham, the threats emanating therefrom and even, to an extent, the degree of that particular assault.

Md. Rule 734 provides that:

> "The court may order two or more indictments tried together if the offenses and the defendants, if there be more than one, could have been found in a single indictment."

One of the factors to be considered in the trial judge's determination of whether to grant a severance is the saving of the time and the expense that unnecessary separate trials would entail. *Mason v. State*, 18 Md. App. 130, 305 A. 2d 492 (1973); *Peterson v. State*, 15 Md. App. 478, 292 A. 2d 714 (1972). Moreover, the decision as to whether to order separate trials is vested in the sound discretion of the trial judge. *Maloney v. State*, 17 Md. App. 609, 304 A. 2d 260 (1973). If it appears that the facts to be proved in one case are substantially the same as those in the other or that they are so closely related that the evidence necessary to show one crime is intertwined with the other, there is no reason to order a severance unless the joinder is prejudicial. We observe no prejudice to appellant, and conclude that the trial judge properly denied the severance motion.

## II.

> "The court erred in failing to disclose Grand Jury testimony to the appellant or to examine the prior testimony *in camera*."

The appellant proffered that Frieda Anderson, William Moore and two other persons had appeared before the Grand Jury. The appellant then asked the court for the right to examine the Grand Jury minutes in order to ascertain whether those "statements contained exculpatory evidence", or in the alternative, that the court examine *in camera* the minutes of the Grand Jury so that the court might determine whether any of the witnesses's testimony before the Grand Jury was of an exculpatory nature. The State informed the court that there was nothing in the Grand Jury minutes that was exculpatory. The trial judge refused to allow the examination of the minutes and declined to view them *in camera*.

The Supreme Court in *Brady v. Maryland*, 373 U. S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963) held that there is a violation of due process of law where the prosecution suppresses evidence favorable to the accused, irrespective of whether such suppression was made in good or bad faith by the prosecution, but such holding did not give rise to a *per se* right to examine Grand Jury minutes. Later in *Dennis v. United States*, 384 U. S. 855, 86 S. Ct. 1840, 16 L.Ed.2d 973 (1966) the Court stated that an accused in a criminal case *may* be allowed to view the minutes of the Grand Jury when he demonstrates a "particularized need" to do so. *See Avery v. State*, 15 Md. App. 520, 292 A. 2d 728 (1972); *Silbert v. State*, 12 Md. App. 516, 280 A. 2d 55 (1971); *Grimm v. State*, 6 Md. App. 321, 251 A. 2d 230 (1969). It is apparent from a reading of the record that appellant sought to conduct an egregious fishing trip into the minutes of the Grand Jury in the fervent hope that he might possibly stumble across something that would be beneficial to him. The mere hope that Grand Jury minutes may possibly contain some exculpatory evidence is not enough to demonstrate the "particularized need" to which either the Supreme Court

alluded in *Dennis, supra,* or to which this Court referred in *Grimm v. State, supra.* In the light of the appellant's failure to exhibit a "particularized need" the trial judge did not abuse his discretion in denying the appellant's motion to examine the Grand Jury minutes, nor did the judge err in refusing to conduct an *in camera* examination of the minutes.

### III.

"The trial court erred in allowing the State to cross-examine the appellant in regard to a prior statement without first showing the voluntariness of that statement."

After appellant was taken into custody he was advised of his rights under *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). According to a detective, whose testimony the State offered in its case in chief, the appellant elected to exercise his *Miranda* rights and specifically requested an attorney. Notwithstanding the appellant's employment of *Miranda,* the police thereafter engaged appellant in what was characterized by the detective as "general conversation".[1] The State then sought to introduce into evidence the content of that "general conversation", but the trial judge, at a hearing out of the presence of the jury, suppressed it on the ground that *Miranda* expressly forbade its introduction. After the appellant had testified in his own behalf, the State based part of its cross-examination of the appellant upon the "general conversation". The appellant's counsel objected to the State's use of the conversation for cross-examination purposes, but the trial judge ruled that "any inconsistent prior statement is admissible [for impeachment purposes] ". Patently, the trial court based its ruling upon *Harris v. New York,* 401 U. S. 222, 91 S. Ct. 643, 28 L.Ed.2d 1 (1971) wherein the Supreme Court held:

---

1. How a "general conversation" is distinguished from a "statement" or "confession" is not explained. It would appear, however, that the use of the term "general conversation" is but an exercise in semantics designed to circumvent Miranda.

> "*Miranda* barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel. It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards."

Following the trial judge's ruling, the State then propounded a series of questions to the appellant, and the appellant disavowed making any statement to the detective or having any conversation with him. After the court's holding, no objection was interposed to any of the questions put to the appellant. On appeal to this Court appellant argues strenuously that *Harris* does not erode *Miranda* in such a way as to sanction the use of a statement, or a "general conversation", made to the police after *Miranda* has been invoked.

This question is not properly before us inasmuch as the appellant did not object to the questions when they were posed to the appellant. Cases are legion in the Court of Appeals to the effect that an objection must be made to each and every question, and that an objection prior to the time the questions are asked is insufficient to preserve the matter for appellate review. *See S & S Bldg. Corp. v. Fidelity Storage*, 270 Md. 184, 310 A. 2d 778 (1973); *Spriggs v. Levitt & Sons, Inc.*, 267 Md. 679, 298 A. 2d 442 (1973); *Hyson v. State*, 225 Md. 140, 169 A. 2d 449 (1961); *Journigan v. State*, 223 Md. 405, 164 A. 2d 896 (1960); *State Roads Comm. v. Bare*, 220 Md. 91, 151 A. 2d 154 (1959); *Davis v. State*, 189 Md. 269, 55 A. 2d 702 (1947); *Wilkins v. State*, 11 Md. App. 113, 273 A. 2d 236 (1971); *Douglas v. State*, 9 Md. App. 647, 267 A. 2d 291 (1970); *Veihmeyer v. State*, 3 Md. App. 702, 240 A. 2d 649 (1968). *See also* Md. Rule 522 d 2. Moreover, we are unable to ascertain on the basis of this record whether appellant's testimony was in conflict with the gist of the "general conversation" and thus useable for impeachment purposes under the holding of *Harris, supra.*

## IV.

"The Court erred in allowing the State to impeach the appellant because of his assertion of his Fifth Amendment rights."

When the appellant testified, he denied culpability for both of the crimes for which he stood trial. By his testimony appellant endeavored to shift the responsibility for the commission of the offenses to "big man". He denied any knowledge of the slaying of Herring, and stated that "big man" and Herring were friends. Appellant also said that Herring and "big man" had both worked at "Manpower". On re-cross-examination the State asked, "Did you ever tell the police that big man worked at 'Manpower' or give them any information as to the big man?" An objection was interposed, and a bench conference ensued at which appellant's counsel articulated his reasons as to why the objection should be sustained. He opined that the State was using appellant's "silence" against appellant. The objection was overruled, and the question was repeated in substantially the same form. The appellant responded, "I don't know. Not that I recall." The State then continued, "Did you ever talk to the police and tell them what you are telling us today?" The defendant responded, "No."

Chief Justice Warren in *Miranda, supra,* stated:

"In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecutor may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation." 384 U. S. at 468, n. 37.

The appellant had earlier testified that when the *Miranda* warnings were given to him he exercised his right to remain silent, and, as we have previously noted, disavowed any "general conversation" with the detective.

The Court of Appeals in *Younie v. State,* 272 Md. 233, 322 A. 2d 211 (1974) held that the State may not exploit an

accused's standing silent after having relied upon *Miranda*. The Court quoted with approval our opinion in *Burko v. State*, 19 Md. App. 645, 652, 313 A. 2d 864 (1974), *cert. denied* 271 Md. 732 (1974), wherein we stated:

> " . . . To allow the police to make an accusatory statement to one who had elected to remain silent and then to permit the police to testify that when the defendant had been accused he did not answer, would have a devastating effect upon the defense. Such tactics, if allowed, would have cloaked the precepts of *Miranda* in an armor of gauze."

The rationale of *Younie* and *Burko* is applicable here. It is but one small step from the use of silence in the face of accusation condemned in *Younie* and *Burko*, to the way in which appellant's silence was exploited in this case. We observe no rational distinction between the questioning that we found violative of *Miranda* in the *Burko* case and what the State did in the present matter. We think the State's permitted use of the questions, hereinabove quoted, transgresses both *Younie* and *Burko*. The State has beaten the shield of *Miranda* into a sword, and then used it as a weapon against the appellant. *Harris, supra,* does not permit "the shield provided by *Miranda* [to] be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." On the other hand, it certainly does not allow the State to fashion the accused's in-custody silence into a tacit admission.

The State argues that the appellant's silence was properly used against him for purposes of impeachment. The same contention, based on a similar factual background, was raised in *People v. Calhoun*, 33 Mich. App. 141, 189 N.W.2d 743 (C.A. Div. 1, 1971). The court said:

> "We read *Harris* to include inconsistent 'non-utterances' as well as 'utterances'. When defendants introduced 'Billy' into the act it was perfectly proper to question him as to the point wherein he first mentioned 'Billy's' complicity in the occurrence.

The adversary process should certainly permit cross-examination as to a defense theory which without any challenge would permit a testifying accused to rely on any hypothesis however nebulous and yet bars the prosecution from subjecting the specifics of it from 'truth-testing devices'."

Judge Levin availed himself of the opportunity presented by *People v. McColor*, 36 Mich. App. 455, 194 N.W.2d 99 (1971), and loosed a scathing attack on the logic upon which *Calhoun* was based. The judge said in n. 2 of his dissent that:

"The practical effect of *Calhoun* is that an accused person must decide when he is arrested, without hesitation and without the advice of counsel, whether he will testify at the time of trial. Even if a lawyer were present when he was arrested, the lawyer would have to be omniscient to decide at that time, without consultation with his client, whether the client should take the stand at the time of trial.

In *Harris* the defendant gave a statement; he did not exercise his privilege to remain silent. At stake in *Harris* was the enforcement of the *Miranda* warnings requirement. It was thought that the failure to give the *Miranda* warnings was not of such importance as to require suppression of a statement actually and voluntarily given.

The issue here concerns the protection of the constitutional right to remain silent. Also at stake is the Fourteenth Amendment right to take the stand. *Harris* concerns the *Miranda* warnings. The rights with which we are concerned existed before *Miranda*. The difficulties experienced in the enforcement of the *Miranda* requirements should not be seized upon to erode rights existent before *Miranda*."

Subsequently, the Supreme Court of Michigan in *People v. Bobo*, 390 Mich. 355, 359, 212 N.W.2d 190 (1973), overruled

*Calhoun* and stated that the court had nothing to add to Judge Levin's "analysis and criticism except our endorsement." [2] The court went on to say:

> "We will not condone conduct which directly or indirectly restricts the exercise of the constitutional right to remain silent in the face of accusation. 'Non-utterances' are not statements. The fact that a witness did not make a statement may be shown only to contradict his assertion that he did."

To like effect *see Johnson v. Patterson,* 475 F. 2d 1066 (10th Cir. 1973), *cert. denied* 414 U. S. 878, 94 S. Ct. 64, 38 L.Ed.2d 124 (1973); 87 Harv. L. Rev. 882 (1974); *United States ex rel. Young v. Follette,* 308 F. Supp. 670 (D.N.Y. 1970); *State v. Shing,* 109 Ariz. 361, 509 P. 2d 698 (1973); *Hines v. People,* 497 P. 2d 1258 (Colo. 1972); *State v. Griffin,* 120 N.J. Super. 13, 293 A. 2d 217 (1972). The author of a commentary on *Johnson v. Patterson, supra,* opined in 87 Harv. L. Rev. at 887-888:

> "Since the probative value of a defendant's silence is significantly less than that of a defendant's statements, and since allowing prosecution comment on a defendant's silence has a greater effect on police behavior and constitutional rights, the Tenth Circuit correctly distinguished *Harris* in refusing to allow the comments in *Johnson.*"

As we view the case now before us, the appellant's silence while in custody relative to "big man" could not be used against him when he took the stand in his own defense unless appellant testified that he had told the police about "big man". Where, as here, the appellant interposed his *Miranda* rights as a buttress against police interrogation, his failure to speak out on "big man's" involvement in the offenses may not be used by the State as a glaive against the appellant.

---

2. Apparently Judge Levin had, by the time Bobo was decided, joined the Supreme Court of Michigan as a Justice.

The State also contends that the admission of the challenged testimony was "harmless error". We do not see it that way. We are cognizant that in *Collins v. State*, 14 Md. App. 674, 288 A. 2d 221 (1972) we anticipated *Milton v. Wainwright*, 407 U. S. 371, 92 S. Ct. 2174, 33 L.Ed.2d 1 (1972), and held that under certain circumstances a violation of *Miranda* may be harmless. *See Younie v. State*, 19 Md. App. 439, 311 A. 2d 798 (1973), *rev'd on other grounds* by the Court of Appeals of Maryland, *Younie v. State, supra.* *Collins* modified our previous decisions in *Hutchinson v. State*, 9 Md. App. 41, 262 A. 2d 321 (1970), *rev'd on other grounds, State v. Hutchinson*, 260 Md. 227, 271 A. 2d 641 (1970) and *Mulligan v. State*, 6 Md. App. 600, 252 A. 2d 476 (1969). In the instant case, however, we observe no circumstances that render the *Miranda* violation harmless. We believe that when the accused was asked the improper questions concerning his failure to reveal to the police the dastardly role of the elusive, if not ephemeral, "big man", the answers thereto had a devastating effect upon the jury. We think the jury may well have believed, as the State seemingly intended them to believe, that had "big man" been the real culprit in this tragedy, the appellant would have been the first to so vociferate, and thus cast the blame upon "big man". Because we cannot say that the error was harmless beyond a reasonable doubt, we must reverse the judgments and remand the matter for a new trial. In view of our holding it is unnecessary for us to discuss the other contentions raised by appellant.

*Judgments reversed.*
*Case remanded for a new trial.*