# JEFFREY AARON BURKO *v.* STATE OF MARYLAND

[No. 278, September Term, 1973.]

*Decided January 7, 1974.*

646

The cause was argued before MORTON, THOMPSON and GILBERT, JJ.

*Karl G. Feissner*, with whom were *Feissner, Kaplan, Smith, Joseph & Greenwald* on the brief, for appellant.

*Arrie W. Davis, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, George A. Eichhorn, III, Assistant Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County*, and *William T. Wood, Assistant State's Attorney for Montgomery County*, on the brief, for appellee.

GILBERT, J., delivered the opinion of the Court.

At 7:30 P.M. on March 9, 1972, Detective Lieutenant Donald A. Robertson died as the direct result of a gunshot wound to the head. The fatal shot had been fired from the inside of the trunk of an automobile then parked in the garage of the Montgomery County Police Department. Other police officers fired approximately thirty-five (35) bullets into the body of the gunman who was secreted in the trunk, but there was evidence that Lieutenant Robertson's slayer died from a self-inflicted bullet wound to the temple region and not from the police fusillade.

The appellant, Jeffrey Aaron Burko, who at the time of the slaying was in police custody for suspicion of armed robbery, was charged with the murder of Lieutenant Robertson. Appellant was also charged with the armed robbery of Hahn's shoe store situate in Silver Spring, Maryland. After indictment by the Grand Jury for Montgomery County the case was removed to Frederick County for trial. There, a jury presided over by Judge Samuel W. Barrick, found the appellant guilty of murder in the second degree and armed robbery.

In this Court appellant mounts a multifaceted attack on rulings by the trial court both at a pretrial hearing and at trial. He avers:

I. The composition of the petit jury violated constitutional standards because it did not represent a "fair cross-section of the community".

II. The trial judge failed to grant a motion for a mistrial, which motion was predicated upon improper reference by the prosecutor to evidence that had been stricken from the jury's consideration.

III. The evidence was insufficient to sustain a conviction for a second degree murder.

IV. The evidence was also insufficient to sustain the armed robbery conviction.

V. The trial court erred in instructing the jury that there is "a presumption of murder in the second degree", and "that there is a burden upon the appellant to introduce evidence tending to rebut this presumption".

VI. The trial court erred in its instructions to the jury.

Before discussing the several questions posited by the appellant, an abbreviated description of the bizarre facts of this case is in order.

Hahn's shoe store was held up on the afternoon of March 9, 1972 by a lone gunman who, after taking a sum of money in excess of five hundred dollars ($500.00) from the cash register, compelled the employees of the store to get down on the floor. The gunman then fled. Immediately contiguous to Hahn's is an alley, and the felon ran into that alley and disappeared. Within seconds a 1964 blue Rambler exited the alley. It was stopped by the police a short distance from the scene of the crime. The appellant was the driver of the Rambler. He was ordered from the car and frisked. The vehicle was searched for a weapon and the proceeds of the

robbery, but neither was found. The glove compartment of the automobile was locked as was the trunk. The appellant denied ownership of the car and said that it belonged to a "Mr. Turner". Appellant was given the warnings required by *Miranda v. Arizona*, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). In response to the police question as to what the appellant was doing in the rear of Hahn's shoe store, he stated that he was on his way to J.C. Penney's to seek employment. He said that he went to the parking lot in the rear of the Penney store. When he started to go into the rear door of the store, he observed a sign which indicated that that entrance was for employees only. Appellant further stated that realizing the time of day and that he was required to meet his friend, Turner, some distance away, he got back into the car and was on his way to meet Turner when he was stopped by the police. The officers asked appellant for the registration card of the vehicle. The appellant responded that the registration card was locked in the glove compartment, and he did not have a key. The police, dissatisfied with appellant's explanation of events, and fully cognizant that the permissive use of the vehicle by appellant had not been established, instructed the appellant to drive the car to the police station parking lot which was about one mile from the scene of the hold up. Upon arrival at the station house appellant was again given his *Miranda* warnings, and he waived the right to counsel. Appellant did, however, seek, and obtain permission to use the telephone to call Turner. In fact the call was placed for him through the police switchboard. There was no answer to appellant's call to Turner for reasons hereinafter vividly clear.

One of the appellant's interrogators went to the Rambler and again conducted a search of the car. The glove compartment and trunk were not searched. Thereafter, the vehicle was removed from the parking lot to the garage of the police building. Subsequently, Lieutenant Robertson, who was apparently puzzled by the failure of the police to find any evidence of the robbery in the car, inquired if anyone had checked the trunk. When the reply to that question was in the negative, the lieutenant and Officer

Franklin Snider went to the car where a fourth search was commenced. The lieutenant and Snider entered the back seat of the vehicle and began to remove it when the lieutenant was suddenly shot in the head. A second shot narrowly missed Officer Snider. The gunman, whose body was subsequently extricated from the trunk, was Steven Van Turner. The appellant was still in the interrogation room. A police officer burst into the room and advised another officer that Lieutenant Robertson had just been shot and killed by a person who had been in the trunk of the Rambler. Upon overhearing this expletive, the appellant exclaimed, "Christ, if I knew he was going to shoot anybody I would have opened the trunk myself. I didn't know he would shoot anyone; I didn't want that Officer killed. I want to die. I wish I had been the one who was shot."

## I.

Appellant argues that the composition of the Frederick County jury was constitutionally proscribed because it excluded those persons who are not registered voters and those who, although registered, were under twenty-one years of age. *Wilkins v. State*, 16 Md. App. 587, 300 A. 2d 411 (1973), *aff'd*, 268 Md. 754, 310 A. 2d 39 (1973), is dispositive of that portion of the appellant's argument concerned with citizens who have not registered to vote. Our recent decision in *Hopkins v. State*, 19 Md. App. 414, 311 A. 2d 483, holding that it is not unconstitutional to deny persons eighteen to twenty-one years of age the right to serve on juries, is dispositive of the second phase of the appellant's contention.

## II.

Appellant perceives reversible error as the result of a remark made by the prosecutor during closing argument. The remark concerned the appellant's failure to inform the police of the presence of Turner in the trunk of the car, which evidence had been earlier stricken with proper admonition to the jury to disregard all references to the fact that the accused did not tell the police that Turner was

hidden in the trunk. Appellant's motion for a mistrial was denied by Judge Barrick, but the judge both informed the jury that the prosecutor's argument was improper and repeated his earlier admonition.

In this Court appellant argues that because he had been apprised of his rights under *Miranda v. Arizona, supra*, he was under no obligation to speak, and the fact that he exercised those rights should not be allowed to be used against him. As we have noted, when the vehicle that the appellant was driving was first stopped, he was given his *Miranda* rights. These rights include the right to remain silent. Thereafter he did not advise the police that anyone was hiding in the trunk, although he did suggest that if the police officers would give him a tire iron he would open the trunk. The fourth time that the appellant was given his *Miranda* warning was, according to the record, 4:55 P.M. on March 9, 1972. In written form he stated "Yea I'll answer your questions", and further indicated that he did not desire an attorney at that time. Patently then, any answers given to any questions following the written *Miranda* warning would be admissible. The first time appellant indicated that he desired the presence of an attorney was when he was taken before a District Court Commissioner at 6:38 P.M. of the same day.

Five times during the trial the State asked of its witnesses whether or not the appellant had informed the police that Turner was in the car. Judge Barrick sustained an objection to two of those questions and subsequently, as we have previously said, struck the answers to the others and told the jury to disregard them.

The most commonly known provisions of *Miranda, supra* at 478-79 are:

" . . . [W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege, and unless other fully effective means are

adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." (Footnote omitted).

*Miranda* precludes the use of a statement or confession obtained in violation of its tenets. The Supreme Court recognized, however, that if its holding went no further than to require that an accused be informed of his rights, that the exercise of those rights could, and in many cases possibly would, be used as a weapon for the prosecution. To allow the police to make an accusatory statement to one who had elected to remain silent and then to permit the police to testify that when the defendant had been accused he did not answer, would have a devastating effect upon the defense. Such tactics, if allowed, would have cloaked the precepts of *Miranda* in an armor of gauze. Chief Justice Warren, anticipating a possible attempt to evade the mandate of *Miranda* in such a manner as previously discussed, wrote for the majority [1] at 468, n. 37:

1. Mr. Justice Clark wrote a separate opinion in which he concurred in part and dissented in part. Mr. Justice Harlan dissented and was joined therein by Mr. Justice Stewart and Mr. Justice White. Mr. Justice White also wrote a separate dissenting opinion in which he was joined by Mr. Justice Harlan and Mr. Justice Stewart.

"In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation. *Cf. Griffin v. California,* 380 U.S. 609 (1965); *Malloy v. Hogan,* 378 U.S. 1, 8 (1964); Comment, 31 U. Chi. L. Rev. 556 (1964); Developments in the Law-Confessions, 79 Harv. L. Rev. 935, 1041-1044 (1966). See also *Bram v. United States,* 168 U.S. 532, 562 (1897)."

*See also Cooper v. State,* 231 Md. 248, 189 A. 2d 620 (1963); *Miller v. State,* 231 Md. 215, 189 A. 2d 635 (1963); *Duckett v. State,* 3 Md. App. 563, 240 A. 2d 332 (1968); *Barnes v. State,* 1 Md. App. 123, 227 A. 2d 763 (1967).

The short answer to the appellant's contention is that the testimony relative to the custodial interrogation was stricken from the jury's consideration, and they were admonished to disregard such testimony. The same admonition applied to the prosecutorial remarks made during closing argument. We cannot say that the jury disobeyed the trial judge's instructions.

There is yet another reason why the appellant's contention is without merit. The trial judge's striking of that testimony produced by the State which dealt with the failure of appellant to reveal Turner's presence in the trunk of the car presented to the appellant more than he was entitled to receive. Appellant, at the time of his arrest, did not elect to stand mute or claim his privilege under the Fifth Amendment. On the contrary, he expressly waived his *Miranda* rights and set about a course that was charted with the purpose in mind of misleading the police in order that appellant and Turner could avoid criminal charges arising from the robbery. In furtherance of his plan, he supplied false information concerning Turner's whereabouts. The waiver of *Miranda* having been made by the appellant, the State should have been allowed to demonstrate that appellant not only gave false information upon which the

police relied, thereby causing Lieutenant Robertson's death, but that appellant at no time disclosed that Turner was armed and hidden in the trunk of the car.

*Miranda* sanctions silence, not prevarication. Once *Miranda* rights have been waived by an accused, and he then makes false or partially true statements, the State has the right to show that the statement of the accused is a lie or incomplete. Furthermore, if an accused waives his *Miranda* rights, makes a partial statement and then invokes *Miranda*, the State may use so much of the accused's statement as was made prior to his invocation of *Miranda. See Younie v. State,* 19 Md. App. 439, 311 A. 2d 798.

### III.

Appellant next asserts that there was insufficient evidence to convict him of murder in the second degree. The answer to this contention is found in *Jeter v. State,* 9 Md. App. 575, 267 A. 2d 319 (1970), *aff'd,* 261 Md. 221, 274 A. 2d 337 (1971). In that case Jeter had been apprehended during the breaking of a storehouse. While he was in the custody of the police outside of the storehouse, his accomplice inside the warehouse shot a guard to death. Jeter contended that the homicide "was not a natural and probable consequence of his agreement to participate in the storehouse breaking", and he was in police custody at the time the accomplice committed the homicide. We said, at 579-80:

"In the facts here it is important to note that appellant knew that his codefendant had a gun before either party entered the building. While it is possible to imagine hypothetical crimes in which guns are used for purposes other than shooting, specifically shooting at people, it would be to fly in the face of reality to ignore that guns in a criminal situation are usually used to effect the crime desired or to prevent interference. Thus as the Court said in *Romero v. State,* 101 Neb. 650, 164 N. W. 554, 555:

'In the instant case the [appellant] by his

own testimony knew that his companion had a gun. He was bound to know that his companion might use it in resistance of an officer who might attempt to arrest him. The attempt to arrest is an interference with their plans. It is common experience that persons engaged in committing a felony may kill those who interfere. Such appears to be the general, though possibly not the universal, holding of the courts.'

Also the Court said in *People v. Durham*, 449 P. 2d 198 (Cal. 1969):

"[P]istols are used by burglars, not for breaking into safes, but for preventing interference with the criminal design or arrest by those who may discover its existence."

*See also State v. Boone*, 257 P. 739 (Kansas 1927) wherein the Court said:

"The evidence that the companions of the appellant took guns with them tended to prove that they intended to kill if it became necessary in order to accomplish their design or to effect their escape."

It is apparent that the homicide in the instant case was natural and probable since Jeter had entered a plan to commit a felony, had gone with the other felons to the site of the crime, and knew that one of his codefendants had a gun. It was a natural and probable consequence that the gun was actually used to shoot and kill an interfering party. It would be unreal, if not fantastic, to believe that someone in Jeter's position would believe his codefendant armed with a gun, being inside a warehouse would surrender meekly instead of using the weapon.

The question of what is or is not a natural probable consequence is a question of fact for the trier of fact. See *People v. Durham, supra, People v.*

*Kauffman*, 92 P. 861 (Cal. 1907), *People v. King*, 85 P. 2d 928 (Cal. 1938), and Wharton, *Criminal Law and Procedure*, § 90. In the instant case we cannot say that the trial judge was clearly erroneous in deciding that the homicide stemmed naturally from the use of a gun in the perpetration of the felony."

It is clear that appellant in the case at bar was in custody at the time Robertson was slain. We, therefore, review the facts briefly in order to demonstrate the application of the rule of *Jeter* to this case.

The testimony revealed that the appellant and Turner had been sharing a hotel room at the Parkside Hotel in the District of Columbia for a period of two or three weeks prior to the robbery. They were seen together by the hotel clerk on the day of the robbery. Appellant had been previously employed in a Hahn's shoe store in Alexandria, Virginia. Turner committed the armed robbery of Hahn's shoe store in Silver Spring, Maryland. When he fled from the store with gun in hand, he ran up an alley and disappeared from sight. Almost immediately thereafter a motor vehicle owned by Turner and driven by the appellant, exited that alley. Appellant, through subterfuge, misled the police into believing that he was on his way to meet Turner who was supposedly waiting some distance from the scene of the hold up. Moreover, appellant professed to attempt to place a telephone call from the police station to Turner. Turner, subsequently, from the trunk of the car, shot to death Lieutenant Robertson, and Turner was in turn shot to death while in the trunk of the car. Appellant, hearing of the shooting, exclaimed that had he known that Turner was going to kill somebody, he, appellant, would have opened the trunk himself.

We think that the facts of this case give rise to a clear inference that the appellant was a participant in the robbery of the store, knew Turner was armed and knew that revolvers, when used by robbers, are not just for the purpose of intimidating the victim into yielding their valuables, but are also utilized for the purpose of making good an escape even to the point of killing, if necessary. The appellant's

conduct following his detention by the police was all in furtherance of a plan to avoid, not only for himself, charges for the offense of robbery, but also to cover-up for Turner, whom he knew to be hidden in the trunk of the motor vehicle. The jury was entitled to find from the evidence presented to it that appellant was under the hope and expectation that Turner's presence would not be detected, that the proceeds of the robbery and the weapon, consequently would not be found, and that both he and Turner would then eschew responsibility for their criminal act. As was stated in *Jeter, supra* at 580:

> *"The question of what is or is not a natural probable consequence is a question of fact for the trier of fact."* (Emphasis supplied).

In our view the evidence was more than sufficient to entitle the jury to conclude, as it did, that the killing of Lieutenant Robertson was a "natural probable consequence" of the combined actions of Turner and the appellant.

## IV.

Appellant's fourth contention is grounded on his belief that there was no credible evidence to show that the robbery of the shoe store was an armed robbery. There were two versions of what transpired during the incident. One witness said that Turner went to the cash register, "laid a pistol beside the register and grabbed some money out of the register." Another witness said that Turner took the money out of the cash register with one hand and when the manager "made a lunge" for Turner, he, Turner, drew forth a gun and ordered the manager to back away. Appellant argues that the taking of the money occurred before a weapon was employed. Consequently, he asserts the offense is larceny not robbery. The argument conveniently overlooks the testimony of the witness who said that the appellant "laid a pistol beside the register" and then took the money. The testimony of that witness is in and of itself sufficient to sustain the charge of armed robbery. Moreover, it has been held that when one commits a larceny and then displays a

weapon so as to overcome the resistance of the witness, the crime is then elevated to robbery. *See* Clark and Marshall, *A Treatise on the Law of Crimes*, § 12.09 (6th ed. Wingersky rev. 1958). *See also* Perkins, *Criminal Law*, ch. 4, § 2C (2d ed. 1969) wherein it is stated, at 284:

> "Furthermore, if one snatches property from the hand of another and uses force or intimidation to prevent an immediate retaking by the other, this is all one transaction and constitutes robbery."

*Cooper v. State*, 9 Md. App. 478, 265 A. 2d 569 (1970); *Giles v. State*, 8 Md. App. 721, 261 A. 2d 806 (1970); *Williams v. State*, 7 Md. App. 683, 256 A. 2d 776 (1969).

## V.

Appellant argues that the trial judge's advisory instructions to the jury that the law "presumes that in the absence of justification, excuse or some other circumstances of mitigation, all homicides are committed with malice and thereby constitute murder in the second degree", denied appellant his constitutional right to due process.

Md. Ann. Code Art. 27, § 407 defines first degree murder as a murder which:

> " . . . shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing . . . ."

Section 408 of the same article provides that any murder committed: "in the perpetration of, or attempt to perpetrate any arson" is also murder in the first degree. The same degree of murder is applicable to the burning or attempt to burn of any "barn, tobacco house, stable, warehouse or other outhouse, not parcel of any dwelling house, having therein any tobacco, hay, grain, horses, cattle, goods, wares or merchandise," by virtue of the provisions of § 409. Section 410 is the so-called felony-murder rule. The statute then provides in § 411:

> "*All other kinds of murder shall be deemed murder in the second degree.*" (Emphasis supplied).

Judge Barrick instructed the jury as quoted above and added:

> "In other words, the presumption is in a homicide that it is murder in the second degree, and the State must prove or has the burden of proving that the murder was actually murder in the first degree."

The judge also informed the jury once the State has proved an unlawful homicide to have been committed by the accused, then,

> " . . . the burden rests upon the defendant not to satisfy you beyond a reasonable doubt but to a fair preponderance of the evidence that the killing happened under certain circumstances to reduce the homicide to manslaughter."

Earlier during his charge the judge stated,

> "In a criminal case the accused is presumed innocent until proven guilty beyond a reasonable doubt. *That presumption attends him throughout the trial* until overcome by proof establishing his guilt beyond a reasonable doubt and to a moral certainty. While the burden is upon the State of establishing by proof every fact material to the guilt of the defendant including every circumstance that enters into the grade or degree of the crime beyond a reasonable doubt and to a moral certainty, it does not mean the State must prove the defendant guilty to an absolute or mathematical certainty. It means such evidence as you would act upon in a matter involving an important affair in your life or in your business or in regard to your property. If the evidence is sufficient that you would act upon it in a very important matter in your life, then it is sufficient to convict in a criminal case. Evidence is sufficient to remove a reasonable doubt when it convinces the judgment of an ordinarily prudent man of the truth

of a proposition with such force that he would act upon that conviction without hesitation in his own most important affairs. *The law does not require the defendant to produce any evidence or to prove his innocence.*" (Emphasis supplied).

Appellant suggests that the court's instructions conflict with the reasonable doubt standard and the presumption of innocence.

Appellant utilizes much the same argument that his counsel made, and we rejected, in *Wilkins v. State, supra.* Appellant has, however, up-dated the argument so as to include citations not present in *Wilkins, i.e. In Re Winship,* 397 U. S. 358, 90 S. Ct. 1068, 25 L.Ed.2d 368 (1970) and *Wilbur v. Robbins,* 349 F. Supp. 149 (D. Me. 1972), *aff'd sub nom. Wilbur v. Mullaney,* 473 F. 2d 943 (1st Cir. 1973). The *Winship* case holds at 364:

"Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."

The *Winship* holding has long been the rule in Maryland. *Malcolm v. State,* 232 Md. 222, 192 A. 2d 281 (1963); *Johnson v. State,* 227 Md. 159, 175 A. 2d 580 (1962); *Tasco v. State,* 223 Md. 503, 165 A. 2d 456 (1960); *cert. denied,* 365 U. S. 885, 81 S. Ct. 1036, 6 L.Ed.2d 195 (1961); *Bollinger v. State,* 208 Md. 298, 117 A. 2d 913 (1955); *Davis v. State,* 202 Md. 463, 97 A. 2d 303 (1953); *Conway v. State,* 15 Md. App. 198, 289 A. 2d 862 (1972); *McDuffie v. State,* 10 Md. App. 190, 268 A. 2d 590 (1970); *Dudonis v. State,* 9 Md. App. 245, 263 A. 2d 624 (1970); *Williams v. State,* 5 Md. App. 450, 247 A. 2d 731 (1968); *Williams v. State,* 3 Md. App. 58, 237 A. 2d 822 (1968).

Appellant's reliance upon the *Wilbur* cases, *supra,* is misplaced as those cases are both inapposite. In *Wilbur* the courts discuss and construe a Maine statute which is

dissimilar to the Maryland statutes concerned with the crime of murder.

The instructions given by Judge Barrick are in keeping with a number of decisions of the Court of Appeals, *see, e.g., Abney v. State*, 244 Md. 444, 223 A. 2d 792 (1966); *DeVaughn v. State*, 232 Md. 447, 194 A. 2d 109 (1963); and this Court in *Lindsay v. State*, 8 Md. App. 100, 258 A. 2d 760 (1969); *Dyson v. State*, 6 Md. App. 453, 251 A. 2d 606 (1969); *Bagley v. State*, 6 Md. App. 375, 251 A. 2d 246 (1969); *Brown v. State*, 4 Md. App. 261, 242 A. 2d 570 (1968). In *Lindsay, supra*, we decided an issue, very much akin to that raised in the present case, in a manner adverse to the position taken by appellant. We are persuaded that our holding in *Lindsay*, as reiterated in *Wilkins*, is correct, and we adhere thereto.

## VI.

Lastly, appellant argues that the trial judge erred in several advisory instructions to the jury. In connection with that argument appellant asserts that the Maryland law that the jury shall be the judges of the law and fact is unconstitutional. Such an argument flies in the face of the decisions of the Court of Appeals in *Giles v. State*, 229 Md. 370, 183 A. 2d 359 (1962), *appeal dismissed,* 372 U. S. 767, 83 S. Ct. 1102, 10 L.Ed.2d 137 (1963); *Hopkins v. State*, 193 Md. 489, 69 A. 2d 456 (1949); *Slansky v. State*, 192 Md. 94, 63 A. 2d 599 (1949); and this Court, *Wilkins v. State, supra; Avey v. State*, 9 Md. App. 227, 263 A. 2d 609 (1970); *Boswell v. State*, 5 Md. App. 571, 249 A. 2d 490 (1968); *Reeves v. State*, 3 Md. App. 195, 238 A. 2d 307 (1968); *Lewis v. State*, 2 Md. App. 678, 237 A. 2d 73 (1968). We view the contention as being devoid of merit.

Without specifically elaborating upon each of the appellant's exceptions to the trial judge's instructions, it is sufficient to state that the jury instructions, when viewed as a whole, set forth the applicable Maryland law. *Fowler v. State*, 18 Md. App. 37, 305 A. 2d 200 (1973); *Kable v. State*, 17 Md. App. 16, 299 A. 2d 493 (1973); *Shotkosky v. State*, 8 Md. App. 492, 261 A. 2d 171 (1970).

A jury instruction, "like a piece of tapestry, is made up of

many strands which interwoven make a pattern; to separate a single one and look at it alone, not only destroys the whole, but gives the strand itself a false value." [2]

*Judgments affirmed.*

_____

2. Judge Learned Hand, *Proceedings In Memory Of Mr. Justice Brandeis,* 317 U. S. XI. (1942).