Charles D. JACOBS, Appellant

v.

UNITED STATES, Appellee.

No. 00–CF–1648.

District of Columbia Court of Appeals.

Argued Nov. 26, 2002.
Decided Nov. 10, 2004.

Matthew W. Greene, appointed by the court, for appellant.

Alex P. Shawe, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher and Barbara J. Valliere, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and FARRELL, Associate Judges, and BELSON, Senior Judge.

PER CURIAM:

After a three-week trial, appellant was convicted of first-degree premeditated murder while armed, two counts of first-degree felony murder while armed, armed robbery, assault with a dangerous weapon, armed kidnapping, second-degree theft, and two weapons offenses. On appeal he argues (1) that the trial court erred by instructing the jury that a guilty verdict on the armed robbery charge could be supported in part by a finding that force was used to "take or keep" the property, rather than simply to "take" the property as stated in the Standard Jury Instructions, and (2) that the trial court erred by admitting into evidence certain "prior consistent statements" of three government witnesses. We reject both of these contentions and affirm, except that two of appellant's convictions for murder (of the same victim) must be vacated. We therefore remand the case for partial resentencing, as set forth in part IV of this opinion.

## I.

On Saturday evening, January 2, 1999, Che Carpenter and Tanina Ashmon walked out of a liquor store and headed for appellant's apartment at 933 52nd Street, N.E.[1] While en route, they encountered appellant as he appeared from behind a building. Appellant told Ms. Ashmon that someone had recently fired a gun at him and that he planned to "get whoever it was that was shooting at him." Appellant then asked Ashmon whether a rifle belonging to

Carpenter was still in her apartment, and Ashmon replied that it was. Appellant knew that Carpenter had a rifle that he wanted to sell; indeed, Ashmon had previously told appellant that if he was interested in buying it, "he could come to [her] house and see it . . . ."

The group, which also included appellant's cousin, proceeded to Ashmon's apartment at 927 52nd Street, N.E., to retrieve the rifle. Once inside, appellant again said that someone had shot at him. At that point he picked up the rifle from Ms. Ashmon's lap as she sat on the couch. As appellant was examining the rifle, Carpenter approached and began to explain to him how the rifle worked. Suddenly appellant "cocked it back," pointed the rifle at Carpenter, and ordered him to "get outside." When Ms. Ashmon asked what he was doing, appellant replied that Carpenter, to whom he referred with an obscene epithet, "almost got me killed."[2] He also pointed the rifle at Ms. Ashmon, said that he was "serious," and threatened to kill Mr. Carpenter. He then forced Carpenter at gunpoint to back out of the apartment and down a staircase that led outside, despite Carpenter's "pleading for his life" and his insistence that he "[didn't] mean to do nothing to [appellant]."

Ms. Ashmon, who remained in the apartment, testified that after Carpenter and appellant had gone outside, she heard "a lot of gunshots." She then went outside and found Carpenter's body lying in a pool

---

1. Ashmon and Carpenter were going to appellant's apartment after hearing from a friend in the liquor store that appellant had marijuana and alcohol there. Appellant knew both Ashmon and Carpenter. Ashmon testified that appellant was "one of my closest friends" whom she had known for "about six or seven years," and that they had worked together selling drugs.

2. Two days earlier, on December 31, 1998, Ashmon and Carpenter had engaged in two armed robberies. The victim in one of these robberies was a drug-dealing associate of appellant. During this robbery Carpenter's mask fell off, thus exposing his identity. Appellant seemed to believe that his being shot at was related in some way to this robbery committed by Ashmon and Carpenter.

of blood.[3] After seeing the body, Ashmon went quickly to a nearby convenience store to find a police officer. Ms. Ashmon initially told the police only that there was a dead body outside her apartment building, giving a false account of the surrounding events. However, approximately three days later, she contacted the police again and informed them of the actual circumstances of the murder.

## II.

■ Appellant contends that the trial court erred by allowing the "near constant admission" of prior consistent statements by three government witnesses.[4] He claims that "the prosecutor engaged in a pattern of examination that improperly bootstrapped the witnesses' prior statements in order to improperly bolster their credibility," and that the court abused its discretion by allowing such questioning. He concludes that this abuse requires reversal because of the sheer number of times the government was allowed to ask these questions, the lack of a curative instruction, and the "improper bolstering" which occurred at critical junctures of the government's case.

The government maintains in response that appellant's claim is based on a "deeply flawed interpretation of what constitutes a 'prior consistent statement.'" As the government points out, the prosecutor's questions referred only to earlier testimony elicited at trial, not to prior statements made out of court. Therefore, instead of eliciting prior consistent statements, the prosecutor was merely directing each witness "to his or her earlier testimony from

the trial so that he or she could provide a focused response in the manner most helpful to the jury." Accordingly, the government contends that appellant's claim is "an oblique attack upon the form and content of the government's direct examination questions at trial" rather than a challenge to the admission of prior consistent statements. The government also observes that appellant's brief "merely recounts *the questions posed* by the government *at trial*" rather than the answers given by the witnesses (emphasis in original). "As such," the government maintains, "there is not even evidence for this court to evaluate on appeal." We agree with the government and reject appellant's argument.

■ "The rule barring the introduction of prior consistent statements is designed to prevent the jury from learning that a witness has given the same account *out of court* that he or she gave on the stand." *Sherer v. United States*, 470 A.2d 732, 740 (D.C.1983) (emphasis added). The rationale behind this rule is twofold. First, "a witness' having told the same story on more than one occasion has no bearing on the truth of the statement." *Id.; accord, Warren v. United States*, 436 A.2d 821, 836 (D.C.1981) ("mere repetition does not imply veracity" (citation omitted)). Second, "the prejudice from wrongly admitted prior consistent statements is that the witness' credibility is unfairly bolstered." *Daye v. United States*, 733 A.2d 321, 327 (D.C.1999). However, prior consistent statements may still be admitted to rehabilitate a witness in at least two "exceptional situations," namely, "(1) where

---

3. This testimony was corroborated in part by David White, one of Ashmon's neighbors. Mr. White testified that while he was outside loading laundry into his truck, he heard someone directing another person to go around to the back of the building and then heard a series of gunshots.

4. Appellant challenges a total of thirty-eight questions that incorporated so-called "prior consistent statements" made by three government witnesses: Tanina Ashmon, David White, and Amahad Sharif.

the witness has been impeached with a portion of a statement and the rest of the statement contains relevant information that could be used to meet the force of the impeachment, and (2) where there is a charge of recent fabrication." *Reed v. United States*, 452 A.2d 1173, 1180 (D.C. 1982) (citations omitted).

Turning now to appellant's claim of error, we need not (indeed, we cannot) decide whether the trial court properly admitted prior consistent statements, under the case law summarized above, because the statements on which appellant's argument is based are not properly characterized as prior consistent statements— which are, as *Sherer* and other cases tell us, statements made *out of court*, not in court. At no time did the prosecutor ask any witness about a prior statement that was made out of court, and then seek to elicit a similar response to demonstrate that the witness was still saying the same thing. Rather, in all of the many instances of which appellant complains, the prosecutor began each question by drawing the witness' attention to his or her previous trial testimony as a way of alerting the witness to the subject matter of the question. Thus the government is correct when it says that appellant's claim of error is more properly characterized as a challenge to the form of the questions, rather than to the admission of prior consistent statements. Regulating the form of the questioning is a matter within the sound discretion of the trial court. *See, e.g.,*

*Gardner v. United States*, 698 A.2d 990, 998 (D.C.1997); *Sherrod v. United States*, 478 A.2d 644, 653 (D.C.1984). On the record before us, we find no abuse of that discretion. Thus a claim of such abuse, if made, would surely fail.

### III.

Appellant contends that the trial court erred in instructing the jury that the crime of robbery would be established if, among other things, appellant "took *or kept* [Carpenter's rifle] by using force or violence" (emphasis added).[5] Appellant points out, and the government acknowledges, that there was no evidence that he used or threatened force when he initially took the rifle from Ms. Ashmon's lap; at that point both Ashmon and Carpenter, standing near her, impliedly consented to appellant's custody of the gun as he inspected it—with Carpenter's help—seemingly with the intent to buy it.[6] Thereafter, appellant's argument continues, neither Carpenter nor Ashmon "made any effort or expressed any desire to recover possession of the rifle" (Supp. Br. for App. at 7). The result, he asserts, is that by permitting the jury to equate "take" with "keep" the court modified an element of the offense and "wrongfully avoided the clear implication that the government had not met its burden of proof" that he took the gun by actual or threatened use of force (Br. for App. at 23).

**5.** In the District of Columbia, robbery [D.C.Code § 22–2801 (2001)] retains its common law elements. Thus the government must prove larceny and assault. To support a robbery conviction, the government must prove that there was "(1) a felonious taking, (2) accompanied by an asportation [or carrying away], of (3) personal property of value, (4) from the person of another or in his presence, (5) against his will, (6) by violence or by

putting him in fear, (7)[and] *animo furandi* [the intention to steal]."
*Lattimore v. United States*, 684 A.2d 357, 359 (D.C.1996) (quoting *United States v. McGill*, 159 U.S.App. D.C. 337, 338, 487 F.2d 1208, 1209 (1973)) (additional citations omitted).

**6.** As noted earlier, appellant knew Carpenter had a rifle to sell, and Ashmon had invited him to her house to see it if he was interested in buying it.

We reject this argument. Although appellant initially took possession of the gun pretending—so the jury could find—to examine it with a view to buying it, almost immediately he cocked the rifle, pointed it at Carpenter, and ordered him outside while threatening to kill him.[7] In these circumstances, where the threatened violence occurred directly on the heels of a plainly conditional transfer of possession (conditioned on return or purchase of the gun), it was perfectly logical for the court to instruct the jury that the threatened use of force by appellant did not have to coincide with the initial transfer so long as he used force to prevent Carpenter from regaining possession of the rifle.[8] Our decisions and the common law are consistent with that instruction.

■ Revealing first is that the standard jury instruction in this jurisdiction explains that the use of force or violence "so as to *overcome* or prevent the [victim's] *resistance* satisfies the requirement of force or violence." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.46 (4th ed.1993) (emphasis added).[9] This implies that the assailant may have gained partial or incomplete possession of the property before "resistance" causes him to use force to "overcome" the owner's efforts to take it back. And, contrary to appellant's suggestion, it is beside the point that Carpenter, with the rifle pointed at him and threatened with death,

did not risk a bullet by offering actual resistance to the taking (whether he did so outside the apartment we do not know); the robbery was complete when appellant prevented any such resistance by intimidating the victim with the gun. Furthermore, in keeping with the common law, robbery in this jurisdiction requires the use of force or violence in a "felonious taking ... *accompanied by* an asportation [or carrying away]." *Lattimore, supra* note 5, 684 A.2d at 359 (emphasis added). Although "the slightest moving of an object from its original location may constitute an asportation," *Simmons v. United States,* 554 A.2d 1167, 1171 n. 9 (D.C.1989), the combined requirement of taking and carrying away demonstrates that force or violence used during a *sequence* of actions that includes but is not limited to the initial seizure is sufficient to make out the crime of robbery.

At the very least, we hold, force used by the defendant to obtain complete possession or control of the property satisfies the requirement for taking by force. In *Lattimore, supra* note 5, for example, we held that the requirements of a taking, asportation, and use of force or violence were met where the defendants' *"complete and exclusive control* [was] demonstrated as they physically held the items in their hands while restraining and threatening to shoot [the victim]." *Id.* at 360 (emphasis added).

---

**7.** Although appellant's intent all along may have been to kill or injure Carpenter, he makes no argument that the jury could not also find an intent to steal the rifle, as required for robbery.

**8.** Whenever we say "force was used" or the "use of force" here, we mean not just the actual use of force or violence but threatened force capable of putting a person in reasonable fear of danger. *See* D.C.Code § 22–2801 ("by force or violence ... or by putting in fear"). The jury was instructed accordingly.

**9.** *See, e.g., Turner v. United States,* 57 App. D.C. 39, 40, 16 F.2d 535, 536 (1926) ("under the common law, ... the force used [must be] sufficient to overcome or prevent any resistance, or to put the owner in fear"). By statute, of course, the District also defines "force or violence" as "stealthy seizure or snatching," § 22–2801, hence requiring only that force "necessary to lift a wallet from a pocket." *United States v. Mathis,* 295 U.S.App. D.C. 296, 306, 963 F.2d 399, 409 (1992).

Appellant likewise exercised such "complete and exclusive control" of the rifle once he aimed it at Carpenter and threatened to kill him, but not before. Until then, he had held the rifle with the owner's consent as, in effect, a custodian for the limited purpose of examining it with the intent (or so Carpenter likely thought) to buy it. A leading commentary, ROLLIN M. PERKINS, CRIMINAL LAW (3d ed.1982), underscores this distinction as important to the common law understanding of robbery. Blackstone, Perkins points out, emphasized the robbery requirement that the larceny be accompanied by violence or intimidation by stating: " 'for if one privately steals sixpence from the person of another, and afterwards keeps it by putting him in fear, this is no robbery, for the fear is subsequent ....' " *Id.* at 348 (quoting 4 Bl. Comm. * 242). But, Perkins explains, "[o]ccasionally this has been misapplied":

> For example, during a chance meeting D suggested he might be interested in buying the gun X was carrying and asked permission to examine it, which was granted. Finding the gun loaded D then pointed it at X and told him to run for his life. As X backed away, D ran off with the weapon. A conviction of robbery was reversed on the theory that the resort to intimidation was after the acquisition of the gun. [citation omitted]. *This completely overlooks the distinction between possession and custody.* When D received the gun to examine momentarily in the presence of X, D had custody only. Had he run off with the gun without violence or intimidation he would have been guilty of larceny be-

cause this would have been a trespassory taking and carrying away with all the elements of that offense. And since he actually did this under a threat to kill he clearly committed robbery ....

*Id.* at 348–49 (emphasis added). Although appellant did not "r[u]n off with the weapon" or order Carpenter to "run for his life," the situations are otherwise identical: he initially received what amounted to permission to examine the gun, then pointed it at Carpenter, threatened to kill him, and marched him out of the apartment. In thereby using force to establish his "complete and exclusive control" of the weapon, *Lattimore, supra* note 5, "he clearly committed robbery." PERKINS, *supra; see also* 4 CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW § 463, at 39–40 (15th ed. 1996) ("A thief who finds it necessary to use force or threatened force after a taking of property in order to retain possession may in legal contemplation be viewed as one who never had the requisite dominion and control of the property to qualify as a 'possessor.' Hence, it may be reasoned, the thief has not 'taken' possession of the property until his use of force or threatened force has effectively cut off any immediate resistance to his 'possession.' ").[10]

Other courts have reached a similar conclusion. Most pertinent, perhaps, is *Ball v. State*, 347 Md. 156, 699 A.2d 1170 (1997), where the Court of Appeals of Maryland unanimously adopted the view that

> [t]he use of force during the course of a larceny in order to take the property away from the custodian supplies the element of force necessary to sustain a

---

**10.** This court in other instances has recognized that robbery may be distinguished from larceny because the defendant used force to gain exclusive physical control over the victim's property. *See, e.g., Rouse v. United States,* 402 A.2d 1218, 1220 (D.C.1979) (al-

though defendant used gun to frighten property owner into flight before property was taken, robbery instruction was proper because defendant's use of force prevented owner from exercising control over the property).

robbery conviction. The mere fact that some asportation has occurred before the use of force does not mean that the perpetrator is thereafter not guilty of the offense of robbery. Rather, the totality of the circumstances that surround the taking must be considered. If, as in the instant case,[11] the use of force enables the accused to retain possession of the property in the face of immediate resistance from the victim, then the taking is properly considered a robbery. *Id.* at 1185; *see also In re A.W.K.,* 778 A.2d 314, 319 (D.C.2001) (noting, as this court often has, that "the jurisprudence of [Maryland]" is "the source of the common law of the District of Columbia").

Factually somewhat closer to this case is *People v. Jones,* 990 P.2d 1098 (Colo.App. 1999). There the defendant had agreed to sell a gun to the victim, but decided that he would retake possession of the gun from the victim by "using some excuse," and then keep the gun and the money. *Id.* at 1101. The defendant handed the gun to the victim and received the money, but then asked the victim to return it so that he could demonstrate how to load it. The victim complied, and the defendant chambered a round but then, still holding the gun, pointed it at the victim and said, "You better not say anything or this[ will] come back on you." *Id.* at 1102. The gun then discharged, fatally wounding the victim. *Id.* On appeal, the defendant argued that he took the gun by trickery rather than force, that the taking was complete once he had possession of both the gun and the money, and that any force, threats, or intimidation occurred after the taking was complete. The Colorado Court of Appeals rejected this argument, stating that "the gravamen of robbery is the application of physical force or intimidation against the victim at any time during the course of the transaction culminating in the taking of property from the victim's person or presence." *Id.* at 1106. Even though Colorado's definition of robbery—like the District of Columbia's—does not explicitly mention the use of force to retain possession or escape, the court concluded that the taking is not necessarily over once the defendant has gained initial physical possession of the property. *See also People v. Webster,* 54 Cal.3d 411, 285 Cal.Rptr. 31, 814 P.2d 1273, 1289 (1991) ("The act of 'taking' begins when the separation of the victim from his or her property occurs, and it continues through the forcible consummation."); *People v. Flynn,* 77 Cal.App.4th 766, 91 Cal.Rptr.2d 902, 906 (2000) ("[T]he requisite force or fear [for robbery] need not occur at the time of the initial taking. The use of force or fear to escape or otherwise retain even temporary possession of the property constitutes robbery."); *State v. Leevans,* 70 Wash.2d 681, 424 P.2d 1016, 1019 (Wa.1967) (robbery instruction that included explanation that "[s]uch force or fear must be used to obtain or retain possession of the property taken" was proper) (internal quotation omitted).

Here, to summarize, no sooner had Carpenter impliedly consented to appellant's momentary possession of the rifle for examination, than appellant turned the rifle on him with the threat of deadly force and ordered him out of the apartment at gunpoint. This threat of violence to forestall any attempt by Carpenter to regain possession of the weapon was sufficient to establish the force or violence element of robbery. Any other conclusion would create a perverse incentive to theft backed up

---

11. In *Ball,* the defendant's confession established that the murder victim had surprised him as he was leaving her house (which he had burglarized) with items of her property in his possession. She had "presumably sought to prevent [a]ppellant from removing the items," since she was later found shot to death in the home. *Id.* at 1185.

by a readiness to use force where necessary.[12]

## IV.

■■ Appellant was convicted of premeditated murder and two counts of felony murder based on the same killing. "When there is only one killing, the defendant may not be convicted of more than one murder.... [Appellant] cannot remain convicted of both first-degree premeditated murder and first-degree felony murder of the same victim." *Thacker v. United States*, 599 A.2d 52, 63 (D.C.1991) (citations omitted). We leave it to the trial court on remand to decide which two of the three murder convictions should be vacated. *See id.* at 64 ("Ordinarily we ... leave it to the trial court to decide, in its discretion, which ... murder convictions to vacate" (citations omitted)). However, if the premeditated murder conviction is vacated and one of the two felony murder convictions is allowed to stand, then the predicate felony conviction must also be vacated because it is included in the felony murder. *See Adams v. United States*, 502 A.2d 1011, 1026 & n. 22 (D.C.1986).

Except for the partial remand we order, the judgment of the Superior Court is affirmed.

*So ordered.*

TERRY, Associate Judge, concurring in part and dissenting in part:

I join in parts I and II of the Per Curiam opinion, and I join as well in part IV as far as it goes; however, I respectfully dissent from part III. I agree with appellant that the trial court erred when it modified the standard instruction on robbery, which says that a defendant may be convicted of robbery if the jury finds that he used force to "take" the property of another, by telling the jury instead that it must find that force was used to "take or keep" the property. I would therefore reverse appellant's convictions of armed robbery (count 1 of the indictment) and felony murder based on armed robbery (count 4). Since the instructional error affects only these two counts, I would affirm all the other convictions on the merits, subject only to a remand for partial resentencing as outlined in part IV of the Per Curiam opinion.

The underlying legal issue appears to be one of first impression in the District of Columbia, although it has arisen in the courts of several other jurisdictions. After reviewing the relevant decisions of those courts, I would elect to follow what I regard as the better-reasoned rule and accordingly would hold, in light of the facts of this case, that the modification of the standard instruction was reversible error.

The trial court initially read to the jury the standard instruction on robbery, CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.46 (4th ed.1993).[1] However, at the prosecutor's request, the court agreed to

---

12. It follows from this discussion that we reject appellant's arguments that the evidence was insufficient to support his robbery (and, by implication, felony murder robbery) convictions, and that the challenged instruction by the trial court created a "fatal variance" between the robbery as charged and as submitted to the jury.

1. Standard Instruction No. 4.46 states in part that to establish the elements of robbery, "the government must prove beyond a reasonable doubt ... that the defendant used force or violence to *take* the property ... [and] carried the property away ...." It states further:

> To *take* property means to get possession of it, so as to be able to exercise control over it. The *taking* must be against the will of the complainant ....
> To establish a robbery, it is not sufficient that the defendant simply *took* the property;

re-instruct the jury with a modified version of the standard instruction. Defense counsel made a timely objection, but the court overruled it, saying, "It just seems common-sensical to me.... [I]f you say, 'Let me take a look at your gun,' and then turn around in the next second and steal the weapon, pointing the gun and threatening ... the taking and keeping it was against the will of the possessor of the property. Although, I guess, hypothetically, it could be a theft and ADW [assault with a dangerous weapon], in my view it could also be an armed robbery." The court then gave a modified instruction which said in relevant part:

> To take property means to get possession of it so as to be able to exercise control over it. The *taking or keeping* must be against the will of the complainant....
>
> To establish a robbery, it is not sufficient that the defendant *took or kept* the property. He must have *taken it or kept it* by using force or violence.

[Emphasis added.][2]

Appellant argues that the trial court committed reversible error by instructing the jury in this way. According to appellant, the amended instruction was an erroneous statement of the law that "impermissibly restricted the jury's consideration of relevant evidence, and wrongfully avoided the clear implication that the government had not [met] its burden of proof on this particular charge." The government responds that the jury instruction did not offer a novel definition of robbery, but one that was consistent with the elements of that offense. To support this argument, the government cites cases from several courts that have "declined to impose strict temporal requirements concerning the exercise of force or violence in robbery cases." The government also argues, in a footnote in its brief, that because this court has given a broad meaning to the phrase "immediate actual possession" in the robbery statute, *see, e.g., Leak v. United States,* 757 A.2d 739, 743 (D.C.2000), *cert. denied,* 534 U.S. 1054, 122 S.Ct. 644, 151 L.Ed.2d 562 (2001), this court should also adopt a broad construction of "take."[3]

## I

Our robbery statute, D.C.Code § 22–2901 (1996),[4] states in relevant part:

---

[he] must have *taken* it by using force or violence.
[Emphasis added.]

**2.** The evidence showed that the rifle (the property that appellant was charged with stealing) was voluntarily yielded to appellant by Ms. Ashmon, and that the shooting of Mr. Carpenter with that very same rifle took place a short but appreciable time *after* appellant acquired possession of the rifle, and at a location (outside the apartment) different from the place where the rifle was taken (inside the apartment).

It should be noted that appellant was charged with robbing Carpenter, and not Ashmon, from whom appellant initially took possession of the rifle by picking it up from her lap. The only charge involving Ashmon was assault with a dangerous weapon, as to which

appellant makes no claim of error other than the one which we have addressed (and rejected) in part II of the Per Curiam opinion.

**3.** Appellant does not argue on appeal that there was insufficient evidence that the rifle was in Carpenter's immediate actual possession. *See, e.g., Leak,* 757 A.2d at 743 ("A bicycle lying two feet away from the owner is, undoubtedly, within the victim's immediate actual possession ... [when] the owner is aware of the attempted taking in a setting of force and violence"); *Spencer v. United States,* 73 App. D.C. 98, 99, 116 F.2d 801, 802 (1940) (removal of money from the pocket of trousers lying on a chair while the owner of the trousers was in bed with a prostitute a few feet away was a taking from the owner's immediate actual possession).

**4.** Recodified as D.C.Code § 22–2801 (2001).

"Whoever by force or violence ... shall take from the person or immediate actual possession of another anything of value, is guilty of robbery ...." The essential element of this type of robbery is the use of force, which is the primary distinction between robbery and larceny (or theft, as it is now known in this jurisdiction). *See* 67 AM. JUR. 2D *Robbery* § 3, at 50 (2003). There are, however, at least two views as to when this force must be applied to turn a larceny into a robbery. One such view is that force must precede or be contemporaneous with the taking, in the sense that the force must be used initially to gain physical possession of the property. Another view treats the occurrence as a continuing transaction, so that the use of force to retain the property or to escape may be sufficient to make the crime a robbery, even if the initial taking was not by force. *See* Kristine Cordier Karnezis, Annotation, *Use of Force or Intimidation in Retaining Property or in Attempting to Escape, Rather Than in Taking Property, As Element of Robbery*, 93 A.L.R.3D 643, 645 (1979). Courts are not in agreement on whether the use of force in retaining possession of property previously taken or in attempting to escape, rather than in the physical act of taking the property, supplies the element of force essential to make the offense a robbery. *See* 67 AM. JUR. 2D *Robbery* § 27. "Some courts ... have refused to uphold robbery convictions where force was applied subsequent to the physical act of 'taking,' " while "[o]ther courts, in contrast, have interpreted rob-

bery as a continuous transaction that is not complete until the perpetrator reaches a place of temporary safety." *Ball v. State,* 347 Md. 156, 185, 699 A.2d 1170, 1183–1184 (1997) (citations omitted), *cert. denied,* 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998).

The states that subscribe to the latter view can be further divided into two subcategories. First, there are those with robbery statutes that expressly include the use of force to retain the property or escape with it. Second, there are those with statutes that do not explicitly include the use of force to retain the property or to escape, but in those states the courts have adopted a temporal view of the "taking" requirement that is so broad that force used in such a manner is still considered to have occurred during the taking. Because this sort of force is not expressly contemplated in our statute, the correctness of the trial court's "take or keep" jury instruction hinges on whether this court adheres to the broad temporal view of the "taking" or the more narrow one which I shall discuss momentarily.[5]

The government urges us to adopt the position taken by the Maryland Court of Appeals in *Ball v. State, supra.* Prior to *Ball,* the Maryland Court of Special Appeals required that the force precede or be concurrent with the taking. *See, e.g., Cooper v. State,* 9 Md.App. 478, 480, 265 A.2d 569, 571 (1970) ("there must be evidence of actual violence preceding or accompanying the taking"); *Giles v. State,* 8 Md.App.

---

5. This court has not yet decided which of these two approaches is correct. Appellant cites *Lattimore v. United States,* 684 A.2d 357 (D.C.1996), in which we held that the crime of robbery is comprised of larceny and assault, and that the taking and asportation requirements of larceny are satisfied once the defendant has acquired "complete and exclusive control over the stolen items." *Id.* at 360 (citing *Groomes v. United States,* 155 A.2d 73,

75–76 (D.C.1959)). We then said that "[the defendants'] complete and exclusive control [was] demonstrated as they physically held the items in their hands while restraining and threatening to shoot [the victim]." *Id.* Although *Lattimore* makes clear what is required for the taking element to be satisfied, it does not necessarily establish when the taking is complete. *Lattimore* is therefore of no assistance here.

721, 723, 261 A.2d 806, 808 (1970) ("To constitute robbery, the actual or constructive violence must precede or accompany the taking"). The Court of Special Appeals later abandoned this view in favor of the broader view that subsequent force in the face of resistance would constitute robbery. *See Burko v. State*, 19 Md.App. 645, 657–658, 313 A.2d 864, 871 (1974) ("when one commits a larceny and then displays a weapon so as to overcome the resistance of the witness, the crime is then elevated to robbery" (citations omitted)).

This issue was resolved in *Ball.* In Maryland, robbery is defined not by statute but by case law as "the felonious taking and carrying away of the personal property of another, from his person or in his presence, by violence or putting in fear, or, more succinctly, as larceny from the person, accompanied by violence or putting in fear." *Ball*, 347 Md. at 184, 699 A.2d at 1183 (quoting *West v. State*, 312 Md. 197, 202, 539 A.2d 231, 233 (1988)). With this definition in mind, the court concluded as follows with respect to the timing of the force:

> [T]he better view is that the use of force *during the course of* a larceny in order to take the property away from the custodian supplies the element of force necessary to sustain a robbery conviction. . . . If, as in the instant case, the use of force enables the accused *to retain possession* of the property in the face of immediate resistance from the victim, then the taking is properly considered a robbery.

*Ball,* 347 Md. at 188, 699 A.2d at 1185 (emphasis added). This holding makes clear that the Maryland courts adhere to the broader view of "taking," and thus that in Maryland a taking is not necessarily complete once the defendant has gained physical possession of the stolen property.[6]

Michigan, on the other hand, provides an example of a jurisdiction that defines "taking" narrowly. Like the case law in Maryland and the statute in Colorado, *supra* note 6, Michigan's robbery statute formerly stated, in relevant part: "Any person who shall, by force or violence, or by assault or putting in fear, feloniously rob, steal and take from the person of another . . . any money or property" is guilty of robbery. MICH. COMP. LAWS § 750.530 (2003).[7] In *People v. Randolph,* 466 Mich. 532, 648 N.W.2d 164 (2002), the Michigan Supreme Court overturned previous decisions[8] that followed the "transactional approach" in which a completed larceny may be elevated to robbery if the defendant uses force after the taking and before reaching temporary safety, and "reassert[ed] that the force . . . must occur before or contemporaneously with the felonious taking." *Id.* at 551, 648 N.W.2d at 174. In *Randolph* the defendant stole merchandise from a department store and was seized by a security officer as he was leaving. The defendant broke free from the guard's hold and swung at the guard in his effort to escape. Because of the assault on the guard, which occurred after the defendant gained possession and con-

---

**6.** Colorado case law also adheres to the broad view of taking. *See People v. Jones*, 990 P.2d 1098 (Colo.1999), discussed in the Per Curiam opinion, *ante* at 22. Essentially as in Maryland, robbery is defined in Colorado as follows: "A person who knowingly takes anything of value from the person or presence of another by the use of force, threats, or intimidation commits robbery." COLO. REV. STAT. § 18–4–301 (2002).

**7.** The Michigan statute was completely rewritten in 2004 and no longer contains this language. *See* MICH. COMP. LAWS § 750.530 (2004).

**8.** *E.g., People v. LeFlore,* 96 Mich.App. 557, 293 N.W.2d 628 (1980).

trol of the property, the defendant was convicted of robbery rather than larceny.

After tracing the evolution of the transactional approach in Michigan case law, the court embarked on an exhaustive review of the common law of robbery to demonstrate how it was not in accord with the transactional approach used by the Michigan Court of Appeals. The court began by quoting Blackstone, who defined robbery as "the felonious and forcible taking, from the person of another, of goods or money to any value by violence or putting him in fear," and declared that "[t]he taking must be by force, or a *previous* putting in fear ...." *Id.* at 537–538, 648 N.W.2d at 167 (quoting 4 BLACKSTONE, COMMENTARIES at *241–242) (emphasis added by the Michigan court). As the court pointed out, a number of other commentators also agree with Blackstone's view that, under the common law, the use of force must precede or be contemporaneous with the taking. For example, Professor Torcia has stated:

> At common law, and in some states, force or threatened force ... amounts to robbery only if it is used to "take" property from the possession of another. Force or threatened force used thereaf-

ter, in order to retain possession of the property taken or to facilitate escape, does not qualify. At best, in such a case, the separate offenses of larceny and assault or larceny and battery are committed.

4 CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW § 463, at 33–36 (15th ed.1996) (footnotes omitted).[9] Consequently, the Michigan Supreme Court held that, at common law, a robbery required that the force be used before or contemporaneously with the larcenous taking, and therefore "the 'transactional approach' ... is without pedigree in our law and must be abandoned." *Randolph,* 466 Mich. at 546, 648 N.W.2d at 172. Thus, unlike the Maryland court in *Ball,* the Michigan Supreme Court has adopted the narrow view of taking, which regards the taking as complete once physical possession is gained.[10]

## II

In the case before us, it must be remembered that the exercise of force by appellant—namely, the shooting of Mr. Carpenter—did not occur until after appellant already had physical possession of the rifle.[11] Given the divergence of the case

---

**9.** *See also* 77 C.J.S. *Robbery* § 13, at 605 (1994) ("[t]he test is whether or not the taking of the property has been completed at the time the force or threat is used").

**10.** In Missouri the robbery statute defines "forcibly stealing" as the use of force for the purpose of "[p]reventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking." MO. REV. STAT. § 569.010(1) (1994). The Missouri Court of Appeals has recognized, however, that before the enactment of this statute, "[t]he rule in Missouri has traditionally been that the force ... necessary to prove robbery must precede or be contemporaneous with the taking of the property," but the statutory language "*extended the time* at which the use of force ... may occur [so that

it] can now occur after the taking ...." *State v. Kelly,* 43 S.W.3d 343, 349 (Mo.App.2001) (citations omitted; emphasis added).

**11.** It is of course well established in this jurisdiction that a dead person can be the victim of a robbery under our robbery statute. *See, e.g., Carey v. United States,* 111 U.S.App. D.C. 300, 304–305, 296 F.2d 422, 426–427 (1961). However, the cases that involve robbing a dead person are not applicable here, regardless of whether the intent to steal was formed after the victim was killed, because in those cases force was used to take property after the victim was either dead or unconscious, *See, e.g., Ulmer v. United States,* 649 A.2d 295, 298 (D.C.1994); *Smothers v. United States,* 403 A.2d 306, 313 n. 6 (D.C.1979). Here no force

law, I would conclude, with all due respect to the Maryland and Colorado courts, that the narrow view is the more appropriate one, and more consistent with the common law.[12] I would hold accordingly that the trial court's jury instruction was erroneous insofar as the word "take" in the robbery statute does not have such a broad meaning that it can include force used to effectuate the *keeping* of property. In the District of Columbia robbery retains its common law meaning, *see United States v. Dixon,* 152 U.S.App. D.C. 200, 203, 469 F.2d 940, 943 (1972), and the common law definition has only been expanded by statute to include stealthy takings. *See Irby v. United States,* 250 F.Supp. 983, 988 (D.D.C.1965), *aff'd,* 129 U.S.App. D.C. 17, 390 F.2d 432 (1967) (en banc). While there are, to be sure, differing views as to the temporal requirements of a "taking" at common law, *see, e.g., Randolph,* 466 Mich. at 554, 648 N.W.2d at 176 (Markman, J., dissenting),[13] I believe that the rule adopted by the majority in *Randolph* is the more persuasive and authoritative one.

Moreover, well-settled principles of statutory interpretation favor the narrow view that the taking is complete once physical possession is gained. "It is a maxim of

statutory construction that the language of a statute should be interpreted in accordance with its ordinary and usual sense, and with the meaning commonly attributed to it." *United States v. Thompson,* 347 A.2d 581, 583 (D.C.1975) (citations and internal quotation marks omitted). A reliable method of discovering a word's ordinary meaning is to look it up in the dictionary. In WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 2329 (1976), "take" is defined as "to get into ... one's possession, power, or control." This definition in no way suggests that a "taking" still continues after the item is in one's possession and control. On the contrary, the phrase "to get into" plainly implies that it is the initial gaining of possession that falls within the definition, not any subsequent retaining of possession.

Reading a broad view of "taking" into our statute would ignore the fact that had the legislature intended for the statute to have such a meaning, it could simply have worded the statute differently. For example, Connecticut loosens the temporal requirement by stating that force need only be used "in the course of committing a

---

was used against Mr. Carpenter after he was shot.

**12.** I note that *Ball* and the cases it relies on, such as *People v. Estes,* 147 Cal.App.3d 23, 28, 194 Cal.Rptr. 909, 912 (1983) (defendant used force to prevent a security guard from retaking property stolen from a department store), and *People v. Tinsley,* 176 Mich.App. 119, 120, 439 N.W.2d 313, 314 (1989) (victim and son gave chase, but abandoned their pursuit after the defendant drew a gun), are factually distinguishable from this case in one significant respect. In those cases force was used to overcome resistance by the victim in an attempt to reclaim the property, whereas in the case at bar there was no attempt on the part of anyone to reclaim the rifle from appellant once he had it in his hands.. Thus, even if I were inclined to follow the holding in *Ball,* it

would not be dispositive on the facts of this case.

**13.** *See also* 4 CHARLES E. TORCIA, WHARTON'S CRIMINAL LAW § 463, at 39–40:

Moreover, conceptually, the statutory extension is not necessarily inconsistent with the common-law theory of robbery[.] A thief who finds it necessary to use force or threatened force after a taking of property in order to retain possession may in legal contemplation be viewed as one who never had the requisite dominion and control of the property to qualify as a "possessor." Hence, it may be reasoned, the thief has not "taken" possession of the property until his use of force or threatened force has effectively cut off any immediate resistance to his "possession."

larceny." CONN. GEN. STAT. § 53a–133 (2001). Likewise, New York incorporates the phrase "in the course of committing a larceny" in its robbery statute. N.Y. PENAL LAW § 160 (Consol.2002). While not conclusive, the absence of this or similar language from the District of Columbia statute at least suggests a legislative intent to adopt the more narrow definition of "taking."

The government points out nevertheless that in this jurisdiction the element of "force" in a robbery prosecution has long been held to encompass even the most minimal application of physical effort. Thus, for example, it was held long ago (1940) in the *Spencer* case, *supra* note 3, that "[t]he force used to remove the money from the pocket is sufficient to satisfy the statutory requirement of 'force or violence.'" 73 App. D.C. at 99, 116 F.2d at 802 (citing *Turner v. United States*, 57 App. D.C. 39, 40, 16 F.2d 535, 536 (1926) ("the requirement for force is satisfied within the sense of the statute by an actual physical taking of the property from the person of another")); *accord, e.g., Ulmer v. United States, supra* note 11, 649 A.2d at 298 (quoting *Turner*); *United States v. Mathis*, 295 U.S.App. D.C. 296, 306, 963 F.2d 399, 409 (1992) ("under D.C. law, a defendant may be convicted of a crime requiring proof of 'force or violence' when the only force used is that necessary to lift a wallet from a pocket"). Thus, under the government's theory, the force that appellant used to pick up the rifle from Ms.

Ashmon's lap would satisfy the "force" requirement of the statute, and the error in the "take or keep" instruction would arguably be harmless.

The problem with this theory is that it was never made known to the jury. The government did not differentiate, either in its presentation of the evidence or in its closing argument, between the force necessary to pick up the rifle from Ms. Ashmon's lap and the separate act of force that occurred a few moments later when appellant shot Mr. Carpenter. Nor did the court's instruction draw such a distinction; instead, it was focused, at the urging of the government, on the use of force to "take or keep" the rifle rather than simply to "take" the rifle. Given this record, I cannot find the instructional error harmless.[14]

To summarize, I would reject the broad view of "taking" and adopt the more narrow view, wherein the taking is complete as soon as the property at issue is in the possession and control of the robber. Thus a robbery does not occur if force is applied only after the initial taking, in order to effect an escape or to retain control. In such a situation, the offender may be deemed guilty of assault and larceny (or theft), but not robbery. Because the trial court instructed the jury otherwise, I would reverse appellant's conviction of armed robbery, along with his felony murder conviction based on that same armed

---

14. I suspect that the issue that prompts the present discussion in both this opinion and the Per Curiam opinion is the result of careless drafting of the indictment. The indictment should have charged appellant with taking the rifle from the immediate actual possession *of Ms. Ashmon,* which is what the evidence actually showed; instead, however, it stated that the rifle was taken from the immediate actual possession of Mr. Carpenter. *Cf. Joseph v. United States*, 597 A.2d 14, 19 (D.C.1991). To be sure, the rifle was also—at least in theory—within Carpenter's immediate actual possession as well as Ashmon's, given such cases as *Leak* and *Spencer;* see note 3, *supra.* Nevertheless, if the indictment had been more carefully written, there would probably have been no occasion for the court to modify the standard instruction with the "take or keep" language, and this issue would never have arisen on appeal.

robbery.  Since my colleagues do not agree, I respectfully dissent.